**UNITED STATES v. LEVI.**

No. 9795.

United States Court of Appeals.

Seventh Circuit.

Oct. 7, 1949.

See also 177 F.2d 833.

George R. Jeffrey, Indianapolis, Ind., Sheldon E. Bernstein, Washington, D. C. (Newmyer & Bress, Washington, D. C., of counsel), for appellant.

B. Howard Caughran, United States Attorney, Elba L. Branigin, Jr., Assistant United States Attorney, Indianapolis, Ind., Maurice W. Graston, Assistant United States Attorney, Indianapolis, Ind., for appellee.

Before MAJOR, Chief Judge, and MINTON and DUFFY, Circuit Judges.

DUFFY, Circuit Judge.

Defendant appeals from a judgment of conviction on a charge of conspiracy to steal government property, entered pursuant to a jury verdict. Errors relied upon arise from failure of the court to discharge the jury by reason of alleged prejudicial matters injected into the trial by the prosecution, failure to grant defendant's motion for a judgment of acquittal, rulings on evidence and insufficiency of the evidence to support the verdict and judgment.

The indictment charged that John J. Ward, Jr., Bernard J. Ward, and the defendant conspired to steal 7,812 bed sheets, 3,925 pillow cases, and other goods, the same being property of the United States of America. The evidence shows that Camp Atterbury was formerly a military camp located near the city of Indianapolis, Indiana; that in 1947 and 1948 this camp was in the process of being closed and liquidated; and that three officers, one enlisted man, and 70 civilian employees were stationed on the reservation during the period of the alleged conspiracy.

The defendant, who is 67 years of age, has been conducting a junk business in Elwood, Indiana, for 52 years. Since 1924 his business has been conducted as a corporation under the name of Elwood Iron and Metal Company, Inc. This company is wholly owned by the defendant and immediate family except for one share of stock. Both before and after the time of the alleged conspiracy, the defendant had made numerous purchases of salvage from various army camps, including Camp Atterbury.

In November, 1947, when Warrant Officer Rosen was about to be transferred from Camp Atterbury where he had acted as salvage officer, he introduced defendant to Lt. John J. Ward, Jr. and told defendant he could thereafter deal with Ward on salvage matters. Defendant asked Ward what was going to be done with salvage left over from fires which had destroyed Warehouses 926 and 927, and Ward stated that when a report of survey was approved he would let the defendant know. Several weeks later Ward called defendant by telephone, asking him to come out to Camp Atterbury, which the defendant did. Upon his arrival he stopped at the office of Major Saul who was in command of the camp. Defendant inquired whether Lt. Ward had the authority to dispose of salvage. The defendant testified that Major Saul told him that everything that was left there then was left to the post engineer (Ward), and when defendant asked whether it was all right for him to go ahead and buy, Major Saul answered, "As far as I am concerned, it is." But Saul testified that he limited his remarks to the remains of Warehouses 926 and 927. It is undisputed that the defendant and Ward had a conference, and that defendant agreed to clean up the two jobs. It is also undisputed that the defendant first offered to pay Lt. Ward $500, and when Ward suggested he had better offers, defendant offered to pay $560, and Ward agreed to this figure. His first payment to Ward was $260, and the latter gave defendant a receipt reading,

"Jan. 28, 1948

"Received of A. Levi
"Two hundred sixty—no/100 dollars
"Deposit on scrap & salvage in building 926-927-3107

"John Ward
"1st Lt. CE."

Building 3107 was what remained of a theatre which had burned. Subsequently defendant's employees salvaged scrap from Buildings 926, 927 and 3107, and because defendant claimed insufficient suitable scrap was involved to make the work worthwhile, Lt. Ward permitted the defendant to take five tons of salvage from the post engineer's salvage yard. Prior to the time the salvage was moved, defendant paid Ward $300 additional.

In March, 1948, Lt. Ward mentioned to the defendant that there were between 75 and 80 crates of sheets and pillow cases at the Wakeman General Hospital site at the camp, and asked defendant whether he was interested in them. After several conversations an agreement was made for the removal of these sheets and pillow cases by the defendant, who thereafter made several

payments of cash to Lt. Ward totaling $2,-400 ($2,960 covered all purchases).

On April 17, 1948, at about 7:00 A.M., pursuant to arrangements made by Ward and the defendant, one of defendant's truck drivers, named Bannon, driving one of defendants' trucks, met Lt. Ward and his brother, Bernard J. Ward, at the little used north gate of Camp Atterbury. The Wards escorted the truck to Building 1039. Although Lt. Ward had a key to the lock on the door of the building, he was unable to open it; thereupon he obtained a tire tool and pulled out the staple to which the lock was affixed and thus opened the door. Forty crates were loaded on the defendant's truck. The top, but not all of the sides, of the load were covered by a tarpaulin. As the truck was being driven back toward the north gate, guards approached from the rear in a vehicle. Lt. Ward, who was riding in his automobile near the defendant's truck, spoke to the guards who thereupon turned back. The load of sheets and pillow cases was then driven to defendant's place of business at Elwood. A few days later 30 or 35 additional crates of sheets and pillow cases were delivered to defendant's place of business by Bernard J. Ward, having been transported in a truck which had been rented for that purpose by Lt. Ward. All of the crates were stored, partly covered by a tarpaulin, in an open shed on defendant's premises in Elwood.

The sheets and pillow cases had been used in the hospital. Many had been repaired; others had cigarette burns and holes in them; some crates contained bugs and insects. Nevertheless, in late April defendant sold them, delivered in Chicago, for $5,631.60.

While the crates were stored in the shed, an employee of the local hospital noticed them and informed her superintendent, who in turn inquired of the defendant whether the sheets and pillow cases could be purchased. Defendant informed the superintendent that they were not fit for hospital use and gave her a donation with which to buy new sheets.

Defendant offered the testimony of three character witnesses, and also took the stand in his own behalf. Almost at the close of the testimony the Assistant United States Attorney asked him, "Now, Mr. Levi, are you the same Abraham Levi that was convicted in this court on an attempt to evade and defeat the income tax of the Elwood Iron and Metal Company on last Tuesday in Cause No. ———." The defendant's counsel objected saying, "The defendant objects to that as highly prejudicial, and that has not been passed upon; it has not been settled at all." The court said, "I think that it is unfair." Counsel: "I move that it be stricken out and the jury instructed not to—" The Court: "There is no answer; it was out of place and should not have been asked. You will not pay any attention to that."

Out of the presence of the jury the defendant's counsel moved for a discharge of the jury by reason of the above-mentioned conduct of the prosecuting attorney. The court overruled the motion but said, "We will do the best we can." Shortly thereafter the court instructed the jury, and included therein was the following: "During the course of this trial there was a question propounded to the Defendant Levi by the District Attorney with reference to his having been convicted for a felony within this court within the last few days. That question was improper and should not have been asked, and I am asking you at this time to erase it from your minds entirely in considering the case, not think of it, and not consider that such a question was asked; and, of course, I am certain that you will do that when you come to consider the guilt or innocence of the Defendant Levi."

When the Assistant United States Attorney asked Levi if he were the same Levi who was convicted a few days previously in a tax evasion case, he knew or at least should have known that a judgment of conviction in that case had not been entered, and that the court still had the motion for judgment of acquittal under consideration. Under such circumstances asking that question constituted error. Corti v. Cooney, 1926, 191 Wis. 464, 211 N.W. 274. See also: Thomas v. United States, 74 App.D.C. 167, 121 F.2d 905, 907; Sanford v. United States, 69 App.D.C. 44, 98

F.2d 325, 327; Glover v. United States, 8 Cir., 147 F. 426, 429, 8 Ann.Cas. 1184. The fact is that the judgment of conviction which was thereafter entered in that case has been reversed by this court. United States v. Levi, No. 9794, 177 F.2d 833.

Corti v. Cooney, supra, was a civil case, but the court's well reasoned opinion applies with even greater force in a criminal case. There, Miss Cooney was being cross-examined and plaintiff's counsel, for the purpose of affecting her credibility, asked if she had been convicted of adultery at a designated time and place. When the court sustained the objection, plaintiff's counsel offered in evidence what he designated as a certified copy of the conviction, but the paper actually was a certified copy of a decree of divorce. The court strongly instructed the jury to disregard the question. We quote the following statements by the Wisconsin Supreme Court in this case, 191 Wis. at page 469, 211 N.W. at page 276: "* * * The entire incident was well dramatized and calculated to arouse in the minds of the jury a strong suspicion that the defendant Cooney was a person of loose morals and belonged to a class of persons whose statements are received with great caution and by many individuals regarded as unworthy of belief. * * *"

And, 191 Wis. on page 470, 211 N.W. on page 276: "* * * there was no reason for seeking adventitious aids in the conduct of the trial. * * * It is hard to imagine a device better designed to arouse prejudice in the minds of the jury than that adopted by plaintiffs' counsel. It is practically impossible for any person to disabuse his mind of the impression made by such unwarranted and unlawyerlike statements. * * *"

And, 191 Wis. on p. 471, 211 N.W. on page 276: "That the rights of the defendants were prejudicially affected cannot be doubted. While the trial court ruled promptly and adversely to plaintiffs, no adverse ruling could remove the impression made upon the minds of the jury by the proceeding set out herein. Having given the fatal wound, it is no excuse or justification to say that the knife was withdrawn and an apology made as soon as possible. * * *"

And, 191 Wis. on page 472, 211 N.W. on page 277: "* * * The trial court did its best to meet the situation, but it is considered that there is no effective way of dealing with misconduct of the character disclosed by this record except to set aside the verdict and procure an impartial and unprejudiced jury. A reprimand to the attorney does not cure the wrong done to litigants. These matters have been pointedly and repeatedly called to the attention of attorneys, and where attorneys indulge in conduct of the kind exhibited in this case, they must do it with the knowledge that judgments secured by such methods cannot be approved by this court."

■ The United States Attorney functions as a highly important and vital part in the administration of federal criminal justice. As was said in Berger v. United States, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314, "The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. * * *"

The government insists, however, that if error was committed, it should be disregarded as harmless error under Rule 52, Federal Rules of Criminal Procedure, 18 U.S.C.A. This in turn involves a consideration of whether the testimony of defendant's guilt was "overwhelming"[1] or whether the government's case was "weak."[2]

In Berger v. United States, supra, 295 U.S. at pages 88-89, 55 S.Ct. 629, the Supreme Court characterized the case against

1. "If the case against Berger had been strong, or, as some courts have said, the evidence of his guilt 'overwhelming,' a different conclusion might be reached."

Berger v. United States, supra, 295 U.S. at page 89, 55 S.Ct. at page 633.

2. United States v. Socony-Vacuum Oil Co., Inc., et al., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129.

Berger for conspiracy as "weak," depending as it did upon the testimony of Katz, an accomplice. The likelihood of a conviction herein without Lt. Ward's testimony was slim indeed. This is the same Ward who changed his plea from not guilty to guilty under the unfortunate circumstances set forth in our opinion of today in the case of United States v. Levi, No. 9794, 177 F.2d 833. Knowing that in any event he was guilty of embezzlement or theft, Ward had some incentive to attempt to link an older and experienced man as the instigator of his misdeeds. At the time Ward testified he had not been sentenced on his plea and undoubtedly hoped for leniency.

Still another incident appearing in the testimony was that Bernard Ward, in the presence of his brother John, stated to defendant's counsel that Levi had better put up bond for them or else. In spite of such threat Levi did not put up bond for the Ward brothers and they were confined in prison at least up to the date of the trial.

■ Defendant here complains that although the court gave the jury a cautionary instruction as to the credibility of defendant's personal testimony, he gave no instruction as to the close scrutiny to be given the testimony of an accomplice. Such an instruction should have been given, but defendant's counsel made no request for such an instruction, and entered no objection or exception at the conclusion of the judge's charge by reason of the failure to so instruct. Such objection is required under Rule 30, Federal Rules of Criminal Procedure. The omission to so instruct might have been an oversight, and had the trial judge's attention been called to it by the objection prescribed in Rule 30, it is likely that an instruction on the subject would have been given. However, as this court stated in United States v. Perplies, 165 F.2d 874, we may follow United States v. Atkinson, 297 U.S. 157, 56 S.Ct. 391, 80 L.Ed. 555, and in the public interest notice errors to which no exception has been taken, even though the "exceptional circumstances" mentioned in the Atkinson case, supra, 297 U.S. at page 160, 56 S.Ct. 391, are not present. See: Screws, et al. v. United States, 325 U.S. 91, 107, 65 S.Ct. 1031, 89 L.Ed. 1495, 162 A.L.R. 1330.

Other evidence as consistent with innocence as with guilt disclosed that on a number of prior occasions where defendant had purchased salvage from Army camps, he had made the payments in cash and received from the salvage officers of such camps receipts similar to the receipt given to him by Lt. Ward. When asked why he did not obtain more than one receipt, which was for the first payment, the defendant replied that he had made requests of Lt. Ward for similar receipts but that Ward declined to give same, stating that he was using the money to pay the costs of the construction of a bridge at Camp Atterbury.

An important circumstance entirely consistent with innocence is that defendant caused to be recorded in the regular books and accounts of the Elwood Iron and Metal Company, Inc., each payment made to Lt. Ward. The ledger sheet was entitled, "Atterbury Account," on which entries were made at the time of each transaction, and these items were supported by cross references in the cash journal.

Further, defendant stoutly insists that he never knew that Lt. Ward intended to keep the various sums paid by him for salvage and that after the defendant's visit to the camp commander he never doubted the authority of Lt. Ward to dispose of such articles as he purchased.

Certainly it cannot be said that evidence of the defendant's guilt is "overwhelming." Although some suspicious circumstances were proved, sufficient evidence to prove guilt beyond a reasonable doubt was entirely lacking without the testimony of the accomplice, Ward. The jury was not warned of the frailty of such evidence.

■ On the subject of harmless error we are guided by and must follow three recent Supreme Court cases, all handed down within a six-month period: Bollenbach v. United States, 326 U.S. 607, 66 S.Ct. 402, 90 L.Ed. 350; Bihn v. United States, 328 U.S. 633, 66 S.Ct. 1172, 90 L.Ed. 1485; Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557. In the latter

case the court said, 328 U.S. at pages 763–764, 66 S.Ct. at page 1247:

"Some aids to right judgment may be stated more safely in negative than in affirmative form. Thus, it is not the appellate court's function to determine guilt or innocence. * * * Nor is it to speculate upon probable reconviction and decide according to how the speculation comes out. Appellate judges cannot escape such impressions. But they may not make them sole criteria for reversal or affirmance. Those judgments are exclusively for the jury, given always the necessary minimum evidence legally sufficient to sustain the conviction unaffected by the error. * *

" * * * And the question is, not were they right in their judgment, regardless of the error or its effect upon the verdict. It is rather what effect the error had or reasonably may be taken to have had upon the jury's decision. The crucial thing is the impact of the thing done wrong on the minds of other men, not on one's own, in the total setting. * * *

\* \* \* \* \* \*

"If, when all is said and done, the conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand, except perhaps where the departure is from a constitutional norm or a specific command of Congress. * * * But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand."

■ After reading the entire record, we do not have the conviction that the error did not influence the jury; we are left in grave doubt. The judgment therefore will be reversed and the case remanded for new trial.

MINTON, Circuit Judge (dissenting).

I am unable to agree with the majority. The impeaching question was asked: Had the defendant been convicted of tax evasion only a few days before? The court itself knowing that no such conviction existed did not permit the question to be answered. The court then and there rebuked the United States Attorney for asking it, stated that it should not be considered, and in its instructions the court fully instructed the jury to disregard the question. The government lost that skirmish decidedly. The impeachment of the defendant was halted at its inception. The majority holds that to simply ask the question constituted error. No case is cited that so holds. Three of the cases cited hold only that the question asked here is an improper one to ask, as only a conviction can be inquired about. The case of Corti v. Cooney, 191 Wis. 464, 211 N.W. 274, is nearest in point. There, however, not only was the question asked but when objection was sustained to the question, counsel persisted in offering a record in a non-criminal case that would not have supported the impeaching question. I recognize that a course of improper questioning may become prejudicial conduct. But that is not this case. In my opinion, it was not error to ask the question. The conduct of counsel did not amount to prejudicial conduct.

The majority does not treat of prejudicial conduct of counsel. It finds there was error committed in asking the question and then proceeds to find the error prejudicial, because without co-conspirator Ward's testimony, as a government witness, the case against the defendant is "weak."

The majority disposes of Ward's testimony by, in effect, finding it not credible. It should be remembered that it was not Ward's credibility to which the impeaching question was directed. The majority, it seems to me, in disposing of Ward's testimony on the ground of credibility invades the province of the jury. Credibility is not for us to decide. The fact that the court did not instruct the jury on how to weigh and consider the evidence of a co-conspirator cannot be taken advantage of. No such instruction was requested. With Ward's

testimony in the record the evidence of guilt is clearly supported. And I am unable to dispose of Ward on the grounds of credibility.

For the reason that I think it was not error to ask the question—and no prejudicial conduct of counsel is suggested except the asking of the question—the weakness of the evidence on the whole record is never reached. But if it were I could not dispose of it on the ground of credibility as is done by the majority. I would affirm.