**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Anthony J. DICHIARINTE and Spartico
Mastro, Defendants-Appellants.**

**Nos. 15549, 15550.**

United States Court of Appeals
Seventh Circuit.

Oct. 2, 1967.

Rehearing Denied in No. 15550
Nov. 7, 1967.

**334**

Raymond J. Smith, R. Eugene Pincham, Chicago, Ill., for appellants.

Edward V. Hanrahan, U. S. Atty., Gerald M. Werksman, Chicago, Ill., for appellee, John Peter Lulinski, Asst. U. S. Atty., of counsel.

Before SCHNACKENBERG, SWYGERT and FAIRCHILD, Circuit Judges.

FAIRCHILD, Circuit Judge.

On October 7, 1965, Anthony J. Dichiarinte and Spartico Mastro were convicted by a jury of narcotics offenses occurring August 8, 1959. The indictment charged (1) that they received, concealed and facilitated the transportation and concealment of unlawfully imported heroin (21 U.S.C., sec. 174) and (2) that they sold the same to Salvatore Pisano (since deceased) without an appropriate written order (26 U.S.C., sec. 4705(a) ). A third count, charging that they conspired with Pisano to violate 21 U.S.C., sec. 174, was dismissed at the trial.

The "action" occurred in and near a fruit stand, operated by Pisano, on the northwest corner of Pulaski Road and 47th street, in Chicago. According to government testimony, at about 10:50 p. m. a black 1957 Oldsmobile, occupied only by the driver, moved east on 46th to Pulaski, stopped for the stop sign, moved south on Pulaski to 47th. The driver handed a package through the right hand window to a man wearing a yellow shirt. The man handed the package to Pisano in the 47th street doorway of the fruit stand; Pisano carried it inside and handed it to Wesley Lewis, a government informant, who handed money to Pisano. Informant Lewis (also deceased at the time of trial) left the Pulaski Road entrance of the fruit stand with Arthur Lewis, a government agent. The package was later found to contain about half a pound of heroin. There was evidence that informant Lewis paid Pisano $6,000 in government funds, $3,000 at the time of delivery, just described, and $1,500 in each of two later instalments.

The degree of illumination in the area was not established except as it may be inferred from the agents' accounts of what they saw, the fact that the fruit stand was open for business, and that a filling station occupied the northeast corner of the intersection.

Although we do not have the benefit of informant Lewis' testimony, it is clearly to be inferred from the record that arrangements had been made with Pisano for a purchase, and that several agents were in the area, anticipating it. The man in the yellow shirt was seen in the area from time to time, beginning about 6:15 p. m.

Agents testified at the trial that Dichiarinte was the driver of the Oldsmobile and Mastro was the man in the yellow shirt. Mastro testified that he was not present, and produced character witnesses, and testimony of his wife and daughter tending to show that he must have been at home or with them in the late afternoon and the evening. He produced evidence that he had been at work

that afternoon and had been in his employer's office from 4:00 to 4:30. Several of Dichiarinte's relatives testified that he had been present all evening at a family gathering. This was a celebration of his father's release from a hospital, and the hospital records verified the release on that day.

### Sufficiency of the evidence.

Defendants (more particularly Dichiarinte) challenge the sufficiency of the identification testimony to establish guilt beyond a reasonable doubt. This testimony is outlined as follows:

*As to Dichiarinte.* Agents Schnettler and Morris were in a car parked on the south side of 46th street facing east and close to Pulaski. The 1957 Oldsmobile stopped near them, and the driver turned toward and took a good look at the agents. Both agents identified Dichiarinte at the trial as the driver.

Agent Waltz was in a car parked on the west side of Pulaski between 46th and 47th, facing south. He received a radio communication from Schnettler, looked toward the side and rear as the Oldsmobile approached and passed, and looked closely at the driver. He testified that Dichiarinte was the driver. He followed the Oldsmobile south on Pulaski, stopped at that corner because the light had changed, but looked to the west and saw the delivery of the package.

Agent Lewis was standing on the east curb of Pulaski and saw the Oldsmobile moving south. The driver looked at him. At the trial, he identified Dichiarinte as the driver. After seeing the Oldsmobile, he crossed the street to the Pulaski entrance of the fruit stand and met informant Lewis as he left with the heroin.

None of the agents had seen Dichiarinte before. Later that night, they looked at photographs at the Bureau of Narcotics. All except Morris testified they then recognized a photograph of Dichiarinte.

*As to Mastro.* Agent Lewis testified that as he crossed Pulaski toward the fruit stand he saw the man in the yellow shirt walking toward the south end of the fruit stand, with Pisano behind him. He was not asked whether he could identify him.

Agent Demarest had been present for several hours, but left the area before the time the Oldsmobile arrived. He was in the rear portion of a panel truck parked on the east side of Pulaski between 46th and 47th. He had binoculars and the truck was equipped with vents through which he could see.

For about two hours before 9 p. m. he saw a man he later learned was Mastro and another man walking back and forth on 47th street and on Pulaski Road near the fruit market. Mastro was wearing a yellow long-sleeved sport shirt. About 9:12 he saw Mastro walking south on Pulaski toward the fruit stand, carrying a brown package which he gave to Pisano. Mastro then left the area, walking west on 47th. Later Demarest drove away. He returned, after receiving a radio communication, but at about 11:10.

Demarest had not seen Mastro before. He saw him again September 23 at the Eatabite restaurant and learned his name shortly thereafter.

Agent Waltz had arrived about 5 p. m. and parked about a half block from 47th and Pulaski. He saw the man wearing the yellow shirt, whom he identified as Mastro, and the other man, walking about as described by Demarest. He testified that it was Mastro who later received the package of heroin from Dichiarinte, walked a few steps and handed it to Pisano. He saw Mastro again on September 16 and 22 at the Eatabite restaurant, with Dichiarinte.

It is true that the delivery of the heroin took place at night, that Dichiarinte was in a car, that each agent had only a brief look at his face. The four agents had been together when his picture was selected, and it is humanly possible each was originally uncertain but became certain by a process of agreement. There was no proof that a black Oldsmobile was available to Dichiarinte that night, and the license number was not observed. The agents who identified Mastro saw him from a considerable dis-

tance, apparently did not establish his identity for 6 weeks, and conceivably were influenced then by seeing him as a companion of Dichiarinte. All these factors went to the credibility and weight of the agents' testimony, but they did not render it inherently incredible or incapable of convincing beyond a reasonable doubt.

■ The evidence was sufficient to sustain conviction, although the possibility of mistake counsels specially careful analysis of the fairness of the trial.

One or both defendants assert several grounds for outright dismissal or a new trial. We discuss each as follows:

*Claim of double jeopardy.*

Defendants and Pisano were originally indicted March 9, 1960. Count I, later dismissed, charged unlawful sale by all three to informant Lewis and agent Lewis. Count II charged unlawful concealment, as now charged in Count I. Pisano died in 1962. Informant Lewis died and Count I was dismissed on government motion.

On April 1 and 2, 1963, the parties began to select a jury to try Count II before Judge Parsons. After eight jurors had been selected, it developed that the then government counsel had inquired at the county office where the father of one juror was employed concerning the father's political sponsorship. Judge Parsons evidently concluded that this inquiry created some danger of prejudice, and excused this juror and the other members of that four-juror panel. Later it developed that there were not enough additional veniremen available to fill up the jury and afford each side the appropriate numbers of peremptory challenges. Judge Parsons stated: "It is not a mistrial. There has been no jury selected. It is just that I am declaring the entire venire disqualified and setting the matter over for a new venire."

■ It is clear that the jury was not sworn. Jeopardy had not attached [1] and it is unnecessary to consider the merits of Judge Parsons' solution to the problem which had arisen.

*Alleged denial of speedy trial.* The proceedings in this case can scarcely be termed speedy.

The offense occurred August 8, 1959, and defendants were first indicted and arrested in March, 1960. The abortive jury selection took place in April, 1963, and on April 13, 1964, then government counsel moved for dismissal and told Judge Parsons the case had recently been assigned to himself and an associate, they had re-examined it, did "not think that there is a case here," and received permission from the department to dismiss. The motion was granted.

The present indictment was returned August 6, 1964. Defendants appeared at first by their original counsel, but a substitution became necessary. It should be noted, also, that government counsel changed from time to time.

■ Defendants did not ask for a prompt trial of either indictment, they did not object to continuances, and some of the continuances were granted at their request. Defendants made motions after the return of the second indictment which required time for disposition. Although delay of this extent is undesirable in the administration of justice, responsibility for it must be shared by defendants.

*Alleged rule violations.* Defendants contend that government counsel misrepresented his motive when moving for dismissal on April 13, 1964; that such motion was but a move in a successful plot to remove the case from Judge Parsons, motivated by an opinion allegedly held by government counsel that some other district judge would afford a friendlier or less difficult forum.

It happens that Dichiarinte was indicted April 14 for an income tax offense. Had the first narcotics indictment still been pending before Judge Parsons, the income tax case would presumably, under the local rules of assignment, have been assigned to Judge Parsons. The nar-

---

1. Howard v. United States (9th Cir. 1967), 372 F.2d 294, 297.

cotics indictment having been dismissed, however, the income tax case was assigned by the Executive Committee, and did not happen to fall to Judge Parsons, but to Judge Decker. Then when the new narcotics indictment was returned, the rule required that it be assigned to Judge Decker, because he already had the pending income tax case. And government counsel later requested that the narcotics case be tried first.

Defendants' claim is that government counsel moved to dismiss so that there would be substantial probability that the income tax case would be assigned elsewhere, and, if it was, that re-indictment on the narcotics charge would effect a change of presiding judge.

The main support for the charge arises from the fact that the income tax indictment was returned the day after the government moved to dismiss the narcotics case, and the likelihood that the assistant who was handling the narcotics case knew of the imminence of the income tax indictment. There may be more than coincidence in the two dates, yet it may be that government counsel was quite genuine in his appraisal. Government counsel who had previously been in charge of the narcotics case had been willing to go to trial in April, 1963, notwithstanding the difficulties created by the death of informant Lewis and defendant Pisano, and government counsel who tried the case in 1965 did so successfully. Nevertheless a more cautious point of view on the part of the government counsel who moved to dismiss may well have been sincere. We are reluctant to convict him of the impropriety with which he is charged.

■ After the income tax and narcotics cases were both before Judge Decker, a new local rule was adopted, requiring that when a case is dismissed and a second case is filed involving the same parties and subject matter, it is to be reassigned to the judge to whom the original case was assigned. Defendants moved that Judge Decker transfer the narcotics case under the new rule, but he felt it was inapplicable. It seems to us that all these local rules exist for the purpose of governing the flow of work in the district court as sensibly and efficiently as possible, and not to create a right in a litigant to have his case heard by a particular judge. Even if we were to disagree with the interpretation of one of these rules by a district judge, it would frustrate their purpose to enforce the rule by holding for naught the time and effort which has been expended in a trial, and requiring a similar exercise before a different judge.

*Claimed prejudicial effect of reference to Narcotics Bureau.*

■ Dichiarinte objected to testimony by the agents that they had selected his photograph from a group of pictures at the Bureau of Narcotics. He does not object on the ground that testimony of such identification is a prior consistent statement.[2] His theory is that the reference to the Bureau of Narcotics carried the implication that he was a large scale narcotics violator with a prior criminal record.

There probably is an implication that photographs in the hands of enforcement officers of any description are not selected at random from the public and that some unfavorable history is present. But the possible reasons for its presence are varied, and the jury probably understands that, and pays heed to the instructions of the court that the defendant is presumed innocent. Dichiarinte relies on our recent decision in United States v. Reed.[3] But there the offensive testimony was that a photograph of defendant had been taken in prison, thus directly asserting a prior conviction of crime.

2. See Gilbert v. State of California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (U.S.Sup.Ct.1967); Eidson v. United States, 272 F.2d 684 (10th Cir. 1959); United States v. Forzano, 190 F.2d 687 (2d Cir. 1951); Reichert v. United States, 123 U.S.App.D.C. 294, 359 F.2d 278 (1966).

3. (7th Cir. 1967), 376 F.2d 226.

*Court's failure to instruct that certain evidence must be disregarded.*

■ Defendants objected to testimony as to certain transactions between informant Lewis and Pisano. Apparently the court deemed them admissible only if a conspiracy be shown, and let the testimony stand with a promise to strike it and instruct that it be disregarded if sufficient connecting testimony did not come in. The court dismissed the conspiracy count, but failed to strike or instruct as promised. Perhaps it is a sufficient answer that defendants failed to draw attention to the matter at the close of the trial.

Be that as it may, we do not view the cited material as prejudicial. It relates almost solely to the several payments made to Pisano by informant Lewis, one of them having been in immediate exchange for the heroin which Pisano had obtained seconds before from Dichiarinte via Mastro. The only other item was testimony of agent Lewis that he heard Pisano tell informant Lewis that in the future it would be all right for agent Lewis to handle the money and the merchandise and that Pisano would make arrangements through a friend for this to be done. This last had no probative value on Counts I or II, but as in the other instances, we perceive no prejudice to Dichiarinte or Mastro by its admission, or the failure of the court to strike.

*Cross-examination of Mastro.*

Both defendants contend that certain cross-examination of Mastro was improper and prejudicial. It is true that in a few instances, government counsel's inquiry led to seemingly collateral matters and the court indicated that unless connecting evidence came in later, he would strike the testimony. The court did not, however, do so. But, upon our reading of the testimony in the light of the circumstances, no prejudicial error appears in this respect.

Agents identifying Mastro had testified that they had observed him in the latter part of September, 1959, at the Eatabite restaurant, and one agent saw him there with Dichiarinte. Understandably, Mastro wanted to show his relationship with Dichiarinte to be as casual as he could.

■ On direct examination Mastro testified, in effect, to acquaintance with Dichiarinte many years before, and that, by chance they had renewed acquaintance in February, 1959, and had seen each other a few times during that year. The cross-examination developed facts suggesting a much closer relationship than Mastro had described. At the least, it appeared that Mastro had taken over the Eatabite from a finance company on the recommendation of Dichiarinte, somewhat reluctantly admitted. Some of the questions objected to were an attempt to determine the relationship of Dichiarinte to the restaurant, and whether Mastro was really the owner. Mastro's description of the affair was unsatisfactory, and his manner indicated reluctance. All the transactions inquired about occurred in August and September, 1959. It was legitimate for the government to show a close relationship between the defendants as a circumstance corroborating the claim that they were associated in the alleged offense. The fact that Mastro entered into an unusual relationship with a failing business on the recommendation of Dichiarinte strengthened such corroboration.

There were several questions as to the date of a fire which took place at the restaurant, and a question whether a man named by the prosecutor had been record owner. These matters were left unresolved, but this was, of course, cross-examination.

We do not read the record with the innuendo asserted by defense counsel. Dichiarinte's counsel says: "It was merely an attempt to brand Dichiarinte as a false friend, a lying unscrupulous businessman who would deliberately bankrupt a business and commit arson in order to fraudulently obtain insurance proceeds." Mastro's present counsel says: "From the cross examination, the jury was left with the impression that Mastro had been involved in some shady

financial acquisition of a restaurant which was burned to collect the insurance, and that Mastro was involved in an arson and insurance fraud."

*Instruction on credibility.*

Defendants made timely objections to the instruction on credibility.

The court told the jury: "Every witness is presumed to speak the truth, but this presumption may be outweighed by the manner in which he testifies, by the character of the witness, that is, by the character of the testimony given, or by contradictory evidence." After detailing a number of elements to be considered with respect to each witness' testimony, the court said, "If you find that the presumption of truthfulness to be outweighed as to any witness, then you will give the testimony of that witness such credibility, if any, as you think it deserves."

█ We do not consider this a desirable formulation, although it may not have been prejudicial in this case. In a criminal case a presumption of truthfulness may seem to collide with a presumption of innocence, particularly if the defendant produces no witnesses. Our principal criticism is just that the formula of presumption-and-weighing-factors-against-it is probably of no help to a jury in evaluating credibility and may be confusing. It would be better not to use this language.

The third circuit has commented on this formula as follows:

"It is perhaps safe to say that the vast majority of witnesses speak the truth and that jurors are aware of this. But we have not found an authoritative case, and the prosecution has cited none, casting that tendency of human nature into a legal presumption in a criminal case tried to a jury. In addition to derogating from the jury's sole right to determine the credibility of witnesses, this rule conflicts with the presumption of innocence of a defend-

ant. Attempts to shorten this protective cloak have been nullified by the Courts." [4]

The credibility instruction as a whole was extensive and very similar to the instruction quoted in United States v. Kahn, 7th Cir., 381 F.2d 824 (June 29, 1967), except, of course, for the comments on evidence in that case. In *Kahn*, we concluded the instruction did not prejudice the interests of defendants in the manner they claimed.

Here, too, we have little criticism of the contents of the instruction except with respect to the presumption of truthfulness, just noted. The court did emphasize the witness' interest in the outcome as a factor to be considered. He stated it twice with respect to witnesses in general and again with respect to a defendant who testifies. This might have been excessive emphasis here in view of the great personal interest of Mastro and the alibi witnesses, who were relatives of defendants, as compared with any interest the agents had.

But what we deem important is a remark made by the court in introducing the portion of the instructions concerning credibility, particularly with respect to the arguments of counsel which the jury had just heard.

The court said:

"You have heard a number of witnesses testify in this case, both for the prosecution and for the two defendants. I am going to say something now about the subject of the credibility of witnesses and certain rules that you will apply in that connection.

"I don't think that I have to remind you, and after hearing the arguments of counsel, I am sure that you will agree with me on this, that this case bristles with issues of veracity. It bristles with such issues as to who is telling the truth.

"In instances too numerous to specify, and I don't intend to do it, the testimony of witnesses called by the Gov-

---

4. United States v. Meisch, 370 F.2d 768 (3rd Cir. 1967). See also, United States v. Johnson, 371 F.2d 800 (3rd Cir 1967).

ernment has been contradicted by testimony of the defendants. The Government witnesses make certain statements as to what occurred on this particular occasion, and the defendants have produced evidence on their part as to where they were on the night in question. It is your function and yours alone to decide where the truth lies."

In the remark just quoted, the court seems to have told the jury that the issue was whether the agents or the defense witnesses were lying. This had been the issue posed by the prosecutor in his rebuttal, just concluded: " * * * somewhere there is perjury." Defense counsel, however, had avoided charging the agents with dishonesty.

Defense counsel had called attention to discrepancies in the testimony of the agents, but for the most part he accepted the fact that a man in a black Oldsmobile and a man in a yellow shirt had passed heroin to Pisano, as the agents described. The main thrust of his argument was to point out the difficulties under which the agents made their observations and the lack of any corroborating evidence pointing to defendants. He argued, in substance, that the agents were mistaken in later selecting Dichiarinte and Mastro as the men they had seen.

Government counsel, in rebuttal, intimated that the defense was charging that the agents were framing defendants. He argued that the witnesses on one side or the other must be lying, and the agents would have no reason to lie.

■ We are reluctant to reverse a conviction because of our interpretation of a remark made by the court in the course of instructions which the jury may not have interpreted as we do. "Issues of veracity" and "issues as to who is telling the truth" may, consistent with dictionary definitions, refer to the question of whose testimony is accurate or objectively correct, as well as the question of which witness is honestly relating what he believes. But we think in ordinary parlance, the court's remark would be interpreted by the jury as agreeing with

the prosecutor, that the issue was whether the agents or the defense witnesses were lying.

The crucial testimony against defendants was based on observations under difficult circumstances. The glances at the driver of the Oldsmobile were brief. Were the agents mistaken a little later when they agreed that a photograph of Dichiarinte was a photograph of the driver? The observations made by two agents of the man in the yellow shirt were more leisurely, but from a distance. Were the two agents mistaken six weeks later when they saw Mastro in Dichiarinte's company and agreed he was the man who had worn the yellow shirt?

The difficulties inherent in the government's evidence are underlined by the fact that in 1964 two government attorneys became convinced they had no case, obtained permission of the department of justice to dismiss the case, and so stated before the court.

■ We think it at least a plausible theory that the agents were mistaken, though honest, and that the jury could have acquitted without branding the agents as liars. The defendants had the right to have the jury consider that theory. The court, however, seemingly adopted the prosecutor's proposition that either the agents or the defense witnesses must have lied, without balancing such comment by reminding the jury that they were free to consider the defense theory of mistake.

### Count II.

Defendants claim that the evidence does not support the conviction under Count II. If this case be tried again, this question needs an answer.

■ Count II charged defendants with a sale to Pisano. The proof tended to show successive transfers of possession from Dichiarinte to Mastro, from Mastro to Pisano, and from Pisano to informant Lewis in exchange for cash. One may speculate whether title passed with each change of possession, or whether Mastro and Pisano were agents. Under these circumstances, however, the

narcotics trade being what it is, it seems ludicrous to require the government to prove the relationship which existed. We think the indictment charging a sale to Pisano sufficiently notified the defendants of the accusation even if it could have been demonstrated that Pisano was only their agent, and that the entire transaction, which took place over a span of a few seconds and of about 50 feet, is so readily identifiable that defendants would be adequately protected from second jeopardy under an indictment charging, for instance, that they sold to Lewis.

The judgments are reversed and the cause remanded for further proceedings.

SCHNACKENBERG, Circuit Judge, concurs in result.