**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Robert SCHWARTZ and John J. Pyne,**
**Defendants-Appellants.**

**Nos. 16465, 16466.**

United States Court of Appeals
Seventh Circuit.

July 12, 1968.

Rehearing Denied August 14, 1968
en banc.

Jerome Rotenberg, Edward J. Calihan, Jr., Chicago, Ill., for defendants appellants.

Thomas A. Foran, U. S. Atty., Michael B. Nash, Asst. U. S. Atty., Chicago, Ill., for plaintiff appellee. John Peter Lulinski, Nicholas J. Etten, Asst. U. S. Attys., of counsel.

Before CASTLE, Chief Judge, and FAIRCHILD and CUMMINGS, Circuit Judges.

CUMMINGS, Circuit Judge.

In May 1967, Edmund Pacewicz and defendants John Pyne and Robert Schwartz were indicted for interstate travel (or causing interstate travel) from Chicago to Provo, Utah, on or about March 9, 1964, to promote extortion in violation of a Utah statute,[1] in contravention of Section 1952 of the Criminal Code (18 U.S.C. § 1952). Pacewicz entered a plea of guilty, and defendants Pyne and Schwartz were found guilty after a jury trial.

The evidence showed that on February 25, 1964, Robert P. Thorn, a resident of Salt Lake City, Utah, came to Chicago to attend the National Ready-Mix Concrete Association convention. Thorn was in the construction business in Provo, Utah. On February 27, Thorn attended meetings of the convention and then attended an evening performance of *How to Succeed in Business Without Really Trying* at the Shubert Theatre. On the lapel of his suit he was wearing a convention tag describing him in block letters as follows:

ROBERT P. THORN

THORN ROCK PRODS. CO.

PROVO, UTAH

As he left the theatre at approximately 10:30 p. m., defendant Schwartz, who was standing outside the theatre, hailed Thorn by name. Schwartz explained that he was a manufacturer's representative of heavy equipment and wanted to talk to Thorn about his product. Thorn invited Schwartz to Thorn's room at the Palmer House Hotel to discuss this business.

---

1. Title 76, Ch. 19, Section 19–1 of the Utah Code, which provides:

"Extortion is the obtaining of property from another with his consent, induced by a wrongful use of force or fear."

Defendants do not argue that this case does not involve extortion under that provision of the Utah Code. Therefore, United States v. Nardello, No. 51, October Term 1967, in which the Supreme Court recently noted probable jurisdiction (392 U.S. 923, 88 S.Ct. 2281, 20 L.Ed.2d 1382), is not applicable.

A moment after their arrival in Thorn's room, Schwartz solicited an act of perversion. Thorn immediately ordered Schwartz to leave the room, stating that otherwise he would call the police.

Schwartz then told Thorn that he would be in serious difficulties if he caused any trouble. Schwartz pulled out a folder containing a badge and an I.D. card and told Thorn he was an officer of the Chicago Police Department. Thorn then gave Schwartz his driver's license in a plastic folder containing his business cards. Schwartz took notes from these items and asked Thorn for his business address, the number and ages of his children and information about his automobile and about his wife's automobile.

Schwartz told Thorn that a serious criminal charge would be lodged against him if anything came of this experience. He also told Thorn that his family and business reputation would suffer if he were so charged.

On February 28, Thorn returned to Utah without having called the Chicago Police Department.

On March 9, defendant Pacewicz, calling himself Sergeant Walter Duncan of the Chicago Police Department, appeared at Thorn's office in Provo, Utah. After a 15- or 20-minute conversation, Pacewicz left Thorn's office. A few minutes later, he returned with defendant Pyne, who was introduced as Detective John Anderson of the Chicago Police Department. Pacewicz termed Anderson "a close friend of the father of the young officer" (defendant Schwartz, whom they called Dick) who had visited Thorn's Chicago hotel room. The defendants indicated that Schwartz's father had long been a detective in the Chicago Police Department.

The defendants told Thorn they had a warrant of arrest for his return to Chicago as a result of the Palmer House episode. Pacewicz exhibited papers purportedly for Thorn's arrest and extradition to Illinois. They said that Schwartz was in trouble for not having arrested Thorn, and that Schwartz could only be cleared if Thorn returned to Chicago to stand trial. Thorn said that it would be impossible to do so. Pacewicz said they were obliged to produce Thorn in Chicago or else he would have to post a $25,000 bond. When Thorn advised defendants that he could not raise this amount, Pacewicz said the bond could be reduced to a $10,000 cash bond, resulting in vindication of Schwartz and Thorn. Defendants told Thorn they had to return to Chicago as early as possible.

Later that morning, Thorn gave Pacewicz an envelope containing $10,000 because Thorn was afraid to return to Chicago to face Schwartz's charges. Thorn never recovered this money although Pacewicz had promised its return, less a 10% Illinois bondsman's fee.

Two days later, Pacewicz telephoned Thorn to tell him they would keep everything under control and that the matter would be disposed of in three or four months. In this conversation, Pacewicz refused to give Thorn his business or home telephone number and explained that he was calling on an outside phone to avoid a monitor. He said the case had been continued until a hearing ten or twelve days thence, and they would secure another continuance for 30-45 days. He reported that he had succeeded in straightening out "these two boys" so that everyone felt pretty good about the whole thing "back here."

About a month thereafter, Pyne telephoned Thorn to tell him that they (Pyne and Pacewicz) had gone to court that day and the case had been continued until July 9, and that everything would be straightened out by then.

Both these telephone calls were transcribed. The tape of the March 11th call from Pacewicz to Thorn shows that it was a person-to-person long distance booth call costing $2. The tape of the April 13th call from Pyne to Thorn shows that it was a long distance call from a booth. The tape recordings were played to the jury, but the Court advised the jury that the conversation between Pacewicz and Thorn was not then ad-

missible against Schwartz. The Court also instructed the jury that, absent a common plan, no testimony was applicable to a defendant unless he was present.

On cross-examination, Thorn testified that he had been shown 40 photographs by Federal Bureau of Investigation agents in the latter part of March in Provo, Utah, in an effort to identify Schwartz. Thorn selected a front pose and a profile pose from these photographs.[2] Since the 40 photographs had not been retained together, the District Court ruled that Schwartz's counsel was entitled to see only the two poses that Thorn had identified as Schwartz. In the jury's presence, the district judge asked Government counsel whether these two pictures were retained and were available in Chicago, and FBI agent Cavanaugh replied:

"Yes, sir. They were identified with police numbers and I can get them downstairs [at the FBI headquarters in Chicago], or copies, which are the only photographs available on that P.D. number."

Thereupon, outside the presence of the jury, defense counsel moved unsuccessfully for a mistrial.

A Chicago police sergeant testified that he had been unable to find any arrest warrant for Thorn. Another Chicago police officer stated that there were no Police Department records as to a Sergeant Walter Duncan nor as to a caucasian Detective John Anderson.

FBI agent Kotsos testified that after arresting defendant Pyne in his residence at 10458 South Claremont Avenue in Chicago on June 24, 1966, he searched the residence as an incident to the arrest and discovered two blank Chicago Police Department cards, one for a sergeant and one for a detective.

A Salt Lake City, Utah, Avis Rent-a-Car clerk identified Pacewicz as the man who rented a Ford car from her at the Salt Lake City airport on March 8, 1964, at 9:15 p. m., returning it at 2:00 p. m. on March 9. She identified Pyne as being in the vicinity of the Avis counter at the time the car rental agreement was signed.

Another FBI agent testified that the signature on the Avis rental agreement was that of defendant Pacewicz.

### Constitutionality of Federal Statute

 Defendant Pyne complains that Section 1952 of the Criminal Code (18 U.S.C. § 1952)[3] violates the Fifth Amendment because it incorporates state statutes that vary throughout the United States. The same argument was rejected in Turf Center, Inc. v. United States, 325 F.2d 793, 795–796 (9th Cir. 1963), and in Spinelli v. United States, 382 F.2d 871, 890 (8th Cir. 1967), certiorari granted, 390 U.S. 942, 88 S.Ct. 1025, 19 L.Ed.2d 1130.[4] We agree with the 8th and 9th Circuits that Section 1952 does not violate the Fifth Amendment even though there is a lack of uniformity among the state laws upon which it depends. See Clark Distilling Co. v. Western Maryland Railway Co., 242 U.S. 311, 37 S.Ct. 180, 61 L.Ed. 326.

---

2. Thorn positively identified Schwartz outside the United States Commissioner's room in the United States Courthouse in Camden, New Jersey, in September 1966.

3. Section 1952 prescribes a $10,000 maximum fine or 5 year maximum imprisonment, or both, for

 "(a) Whoever travels in interstate * * * commerce, * * * with intent to—

 * * * * *

 "(3) * * * promote, manage, establish, [or] carry on * * * any unlawful activity,

and thereafter performs or attempts to perform any of the acts specified in subparagraph[s] * * * (3) * * *.

 "(b) As used in this section 'unlawful activity' means * * * extortion * * * in violation of the laws of the State in which committed or of the United States."

 * * * * *

4. The constitutionality of this statute was not raised in the petition for certiorari.

### Interstate Travel

■ The defendants argue that there was insufficient evidence to warrant the jury finding that Pacewicz and defendant Pyne had traveled from Chicago to Provo, Utah, on March 8, 1964. Although no direct proof of travel was shown, there was evidence from which the jury could conclude that such an interstate journey had occurred.

The evidence shows that Pacewicz and Pyne rented an Avis car at the Salt Lake City airport on the evening of March 8, and that they conferred with Thorn in his Provo office the following morning. At that conference, they described themselves and Schwartz as representatives of the Chicago Police Department and told Thorn they had to return to Chicago as soon as possible. They indicated that they had come from Chicago on official business—either to "produce [Thorn's] body [to stand trial in Chicago] or a bond of $25,000." After they had obtained the $10,000 from their victim, they returned the rented car at the Salt Lake City airport at 2:00 p. m. on March 9. By thus indicating that they had come from and were going to return to Chicago, Pyne and Pacewicz made admissions against their interests. Although such admissions are ordinarily enough to take an issue to the jury, defendants argue that the admissions did not create a jury question because they were made in the course of a deceptive presentation. Much of what Pyne and Pacewicz told Thorn was false, to be sure, but there is nothing inherently incredible, even in retrospect, about these particular statements. In effect, defendants are asking that the admissions be disregarded because they were surrounded with lies. Pyne and Pacewicz knew the departure point of their Salt Lake City trip. Therefore, there is nothing unfair about giving their admissions the same weight as those of less mendacious persons.

From the foregoing evidence, the jury could conclude that Pacewicz and Pyne had come from Chicago on March 8. The Government at least proved enough to shift the burden of proof to defendants.

Morrison v. People of State of California, 291 U.S. 82, 88–91, 54 S.Ct. 281, 78 L.Ed. 664.

### Instructions

■ All told, five instructions of the District Court have been assailed on appeal. Both defendants complain that it was improper for the word "assuming" to be used in the following two portions of the charge to the jury:

"The first thing we do, of course, when a witness takes the stand is administer the oath to him. He swears to tell the truth. Based on this we start out, at least, *assuming* that the witness is going to speak the truth. This assumption may be outweighed by a lot of factors: the manner in which the witness testifies, by the character of the testimony which he or she gives or by contradictory evidence given by other witnesses.

\* \* \* \* \* \*

"In weighing the testimony of witnesses, I told you we start out *assuming* because they take an oath that the witness is going to tell the truth. This assumption may be outweighed by a lot of factors—the manner and demeanor on the stand, the extent to which their testimony is contradicted by other testimony or other evidence, the extent to which they may be involved or affected by the case, or any other factor; that you are not simply to assume because there are some discrepancies that that means the witness is not believable because we know people's recollections are imperfect, different people see different situations differently at the time, so you are going to have to decide whether discrepancies indicate reliability or unreliability, deliberate misstatement of the facts or accidental failure of recollection or lack thereof." (Emphasis supplied.)

As in United States v. Roviaro, 379 F.2d 911, 915 (7th Cir. 1967), no case was cited in which the giving of such an instruction was the basis of reversal. The instruction given here was different from

the presumption of credibility instructions disapproved in prior cases. In those cases the court stated that the testimony given was presumed to be true in the absence of contrary indications. In contrast, this instruction states that before he gives any testimony, a witness can be expected to tell the truth. It is obviously improper to start out with the expectation that a witness will violate his oath. This instruction attaches to the oath the value which experience dictates it should have. It was based on a revised charge of Judge Mathes,[5] and the explanation following the charge "made it clear that the jury for a variety of reasons could disbelieve an uncontradicted witness", so that there was no reversible error. United States v. Bilotti, 380 F.2d 649, 656 (2d Cir. 1967), certiorari denied, 389 U.S. 944, 88 S.Ct. 308, 19 L.Ed.2d 300.

■ After giving a revised version of Pyne instruction V, the trial court told the jury as follows:

> "*You have to find* from the evidence that the object or purpose of the interstate commerce, if you found there was such interstate commerce, interstate transportation, was extortion; not *obtaining money under false pretentions or false impersonation of an officer or public official.*" (Emphasis supplied.)

Pyne asserts that the italicized language directed the jury to find extortion. Read in context, it is clear that the District Court was telling the jury that it could not convict unless the jury found that the purpose of the interstate travel was extortion, as alleged in the indictment, rather than obtaining money under false pretentions or through false impersonation of an officer, as proscribed by other Utah statutes. In reality, the district judge was merely instructing the

jury as to defendants' theory of the case. Cf. Roe v. United States, 287 F.2d 435, 440 (5th Cir. 1961), certiorari denied, 368 U.S. 824, 82 S.Ct. 43, 7 L.Ed.2d 29; Bryan v. United States, 373 F.2d 403, 407 (5th Cir. 1967). The instruction did not state that extortion had been proved as a matter of law.

■ Defendant Schwartz objects to the following instruction:

> "In this connection, you understand that the law logically permits you to infer that a person ordinarily intends the natural and probable consequences of acts which he does or fails to do, statements which he makes, and so forth."

This instruction was taken from Sec. 4.06 of the Mathes jury instructions (27 F.R. D. 39, 78 (1960)). This single sentence has been isolated from nine paragraphs of the charge with respect to intent. Considered as a whole, the detailed instructions on intent could not have been prejudicial, especially since, under the common plan found, the evidence of intent to extort was strong. See United States v. Levi, 177 F.2d 827, 830, 831 (7th Cir. 1949); United States v. Largo, 346 F.2d 253, 256 (7th Cir. 1965), certiorari denied, 382 U.S. 904, 86 S.Ct. 240, 15 L.Ed.2d 157; United States v. Roviaro, 379 F.2d 911, 914 (7th Cir. 1967).

■ Defendant Schwartz did not testify nor present any witnesses. He complains that the District Court should not have instructed the jury that he had an absolute right not to take the witness stand. Such an instruction is considered to be helpful rather than prejudicial to a defendant. United States v. Garguilo, 310 F.2d 249, 252 (2d Cir. 1962); United States v. Kelly, 349 F.2d 720, 769 (2d Cir. 1965), certiorari denied, 384 U.S. 947, 86 S.Ct. 1467, 16 L.Ed.2d 544. It was not reversible error to refuse to allow Schwartz to forego the benefit of Section

---

5. Mathes and Devitt, Federal Jury Practice and Instructions (1965), No. 72.01 provides:
 "Ordinarily, it is assumed that a witness will speak the truth. But this assumption may be dispelled by the ap-

pearance and conduct of the witness, or by the manner in which the witness testifies, or by the character of the testimony given, or by the evidence to the contrary of the testimony given."

3481 of the Criminal Code (18 U.S.C. § 3481) ensuring his right not to testify. Windisch v. United States, 295 F.2d 531, 533 (5th Cir. 1961).

■ The final instruction assailed by Schwartz relates to aiding and abetting. Schwartz claims that the Court should have coupled thereto a limiting instruction to the effect that the jury could only consider the evidence as to the particular defendant's own conduct. No such limiting instruction was requested by Schwartz, and the point may not now be considered. Rule 30 of the Federal Rules of Criminal Procedure; United States v. Provenzano, 334 F.2d 678, 691 (3d Cir. 1964), certiorari denied, 379 U.S. 947, 85 S.Ct. 440, 13 L.Ed.2d 544. Moreover, the District Court's aiding and abetting instruction told the jury that the defendant would not be guilty as an aider and abettor unless he "willfully seeks by some action of his to make it [the criminal venture] succeed." Immediately thereafter, the Court equated aiding and abetting with association in a common plan, and the common plan instructions contained the very limitation now sought by Schwartz. The instructions and trial transcript were also replete with admonitions that only Schwartz's own acts and declarations could be considered as evidence against him unless the jury should find he was a member of a common plan. In this setting, the Court's aiding and abetting instructions were neither confusing nor misleading.

### Reference to Schwartz's Photographs

■ In an effort to satisfy defense counsel's request for production of front pose and profile pose photographs that Thorn had identified as Schwartz in late March 1964, the District Court inquired of the Assistant United States Attorney whether these photographs had been retained and were available. FBI agent Cavanaugh, who was seated at the Government counsel table, responded:

"Yes, sir. They were identified with police numbers and I can get them downstairs [in the Chicago headquarters of the FBI], or copies, which are the only copies based on that P.D. number."

Defendant Schwartz argues that this one reference to "police numbers" implied that he had been previously arrested for a criminal offense, thus undermining his right to a fair trial. There is no claim that the FBI agent deliberately volunteered this information in order to prejudice the jury against Schwartz. There is no showing that the police numbers referred to any arrest of Schwartz except for the instant offense.

In United States v. Dichiarinte, 385 F.2d 333 (7th Cir. 1967), we recently rejected a similar argument and distinguished United States v. Reed, 376 F.2d 226 (7th Cir. 1967), because "there the offensive testimony was that a photograph of defendant had been taken in prison, thus directly asserting a prior conviction of crime." (See 385 F.2d at p. 337). As in Dichiarinte, there was no testimony here that these photographs were taken in prison, nor was there any showing that Schwartz had been previously connected with a crime. Furthermore, in Reed the "mug shot" references were aggravated by testimony that he was an escaped convict. Given the innocuous, unintentional nature of the Cavanaugh incident, the District Court was clearly right in not granting a mistrial.

### Sufficiency of the Evidence as to Schwartz

■ Schwartz claims that there was no proof connecting him to the offense charged, stating that the record fails to show that he ever saw Pyne or Pacewicz prior to the trial. However, at the Palmer House meeting between Schwartz and Thorn, Schwartz made notes as to Thorn's business address, number and ages of children and information about his and his wife's cars. Some of this information, as well as an account of the Palmer House incident, must have been transmitted to Pyne and Pacewicz in order for them convincingly to stage the Provo extortion on March 9. Not only could the jury infer that Pyne and Pacewicz had obtained vital information from

Schwartz, but it was also inferable that it was part of their joint plan to have Pyne and Pacewicz travel to the victim's home town in an effort to extort money from him.

The judgment is affirmed.