367 So.2d 616 (1979)
Henry BROWN, Appellant,
v.
STATE of Florida, Appellee.
No. 48229.
Supreme Court of Florida.
February 1, 1979.
*618 Bennett H. Brummer, Public Defender, and Karen M. Gottlieb, Asst. Public Defender, Miami, for appellant.
Jim Smith, Atty. Gen., and Richard W. Prospect, Asst. Atty. Gen., Tallahassee, for appellee.
PER CURIAM.
Appellant Brown was convicted of first-degree murder and sentenced to death following a jury recommendation of life imprisonment. Our review of this case is predicated on article V, section 3(b)(1) of the Florida Constitution and section 921.141(4), Florida Statutes (1975).

FACTS
On August 3, 1973, Abraham Goldstone drove to a shopping mall to cash a social security check. When he failed to return, his wife reported him missing. That evening a police officer saw five young men pushing a car later identified as belonging to Goldstone. All fled when the officer approached, but he caught up with two and they in some manner implicated Brown. The car was impounded, and an examination disclosed Goldstone's bankbook in the trunk, scuff marks on the interior of the trunk lid, bloodstains and bloodstained towels in the car, and at least one fingerprint later identified as Brown's. In the early morning hours of August 4, officers went to Brown's home, informed his father of their purpose, told Brown his rights, and questioned him. He admitted possession of the car and said he got it from Steve Benyard. Brown was then arrested for possession of a stolen car. After Brown was released, officers developed additional data linking Brown to Goldstone's disappearance and, after again informing Brown of his rights, they questioned him further. He amplified his earlier statement by revealing that he had come across Benyard and Mack Simmons with the car in a school parking lot and that Benyard had said he obtained it at the Sky Lake shopping mall in North Miami Beach.
In the due course of investigation officers discovered Goldstone's body at a small lake near the shopping mall. Goldstone had died from drowning, but his body showed that he also had been shot in the shoulder and hit about the head. On August 10, Simmons was arrested for first-degree murder. Brown and Simmons were then brought together by police officers and told their rights. Simmons was asked whether Brown was involved in the killing and answered in the affirmative. (At trial this statement was introduced through the testimony of the interrogating officer, over objection by the defense on the ground that the statement was inadmissible hearsay.) After being advised of his rights once again, Brown conceded to the police that he was implicated in Goldstone's death.
He related that on August 2 Benyard and Simmons asked him to join them in robbing a bank. He had agreed, and on August 3 they went to the shopping mall to steal a car. They picked Goldstone's car, and when he approached to enter his vehicle Benyard struck him, forced him into the car, and then forced him into the trunk. They drove *619 to Simmons' home. Simmons and Brown wanted to leave Goldstone in an isolated area, but Benyard wanted to kill him. They drove to the lake and Benyard forced Goldstone into the water. All three of them struck Goldstone several times with their fists and with boards, and both Brown and Benyard took turns shooting at Goldstone with Benyard's gun. They left Goldstone for dead, but as they started to leave they observed Goldstone climbing out of the lake. They returned to the water's edge, forced their victim back into the water, and Benyard then held Goldstone below the surface until he was dead. The three conspirators split Goldstone's money, and Brown received Goldstone's watch after asking Benyard's permission to take it. On the night of the crime, but after the police had recovered Goldstone's car, Benyard had come to Brown's home, had threatened and hit Brown, and had taken Goldstone's watch. The facts revealed in Brown's confession are consistent with the physical evidence of the crime and the testimony of Timothy Gordon, a friend of the conspirators who visited them at Simmons' house on the day of the murder.

PROCEDURE
On October 10, Brown was indicted for first-degree murder. He entered a negotiated plea of guilty to second-degree murder, which was accepted by the trial judge. A condition of the plea was that Brown aid the state in the prosecution of Benyard. Brown submitted to a polygraph test and went before the grand jury. He later refused to testify at Benyard's trial, as a consequence of which the negotiated plea was vacated and a plea of not guilty was entered by the trial judge when Brown stood mute. Brown was brought to trial on a charge of first-degree murder, but a hung jury necessitated a second trial. It is from Brown's conviction and sentence in the second trial that review is now sought.
Following Brown's conviction for first-degree murder, a separate sentencing trial was held pursuant to section 921.141(1), Florida Statutes (1975). The jury there learned that Brown was sixteen years old at the time of the crime, that he was not under the influence of any mental or emotional disability, and that he claimed to have fired away from Goldstone, not at him, when the conspirators took turns shooting at him in the lake. The defense elicited testimony that Simmons and Benyard had not received the death penalty, but the trial judge held this revelation to be irrelevant. With the "door opened" by this testimony, however, the trial court permitted the state to show that Brown and Simmons had each negotiated second-degree murder pleas in return for testifying against Benyard, that each had refused to testify (as a consequence of which the state was unable to go to trial against Benyard), and that Benyard was now immune from criminal prosecution.[1] On this record, the jury recommended that Brown be sentenced to life imprisonment.
The trial judge sentenced Brown to death, finding Brown's age at the time of the crime to be the only possible statutory mitigating circumstance but rejecting its significance because Brown "is mature, well beyond his age, and does not appear or act as a juvenile." The trial judge found that Brown's lack of a significant prior criminal record was not a mitigating circumstance because he had an extensive, intervening record of arrests and charges following an escape from the county jail. In regard to aggravating circumstances, the trial judge found that the murder of Goldstone was especially heinous, atrocious, and cruel, and that it was committed during the course of a robbery and kidnapping.

ISSUES
Before us Brown has argued that at least eight errors marred his conviction and sentence. His challenge to the constitutionality *620 of Florida's death penalty statute does not warrant discussion.[2] Additionally, there is no merit whatsoever to his assertions that comments of the trial judge prejudiced his trial,[3] that his confession was involuntary, or that faulty instructions were submitted to the jury. We believe it necessary, however, to discuss fully the four remaining contentions. These are (1) that the double jeopardy clause of the Florida and federal constitutions barred his being tried for first-degree murder, (2) that impermissible hearsay evidence was allowed to go to the jury, (3) that reversible error occurred as a result of prosecution comments on the defendant's silence, and (4) that the death penalty is improper under the circumstances of this case.

(a) Double Jeopardy

Brown argues that he was unconstitutionally twice placed in jeopardy when the state sought to prosecute him for first-degree murder, since an earlier negotiated plea of guilty to second-degree murder had been "accepted" by the trial judge. He relies principally on this Court's decision in Troupe v. Rowe, 283 So.2d 857 (Fla. 1973). The state argues that further prosecution was not barred because Brown refused to testify against Benyard, an understood condition of his bargain which was known to the judge at the time he accepted Brown's "conditional" plea.[4]
There are two distinct questions which arise from Brown's plea of former jeopardy. The first is whether jeopardy in fact "attached." The second is whether, if it did, a reprosecution is nonetheless permitted. We agree with Brown that jeopardy had attached once the trial court accepted his plea of guilty following a full inquiry into its factual foundation. We are not led to conclude, however, that under the circumstances of this case there is any constitutional bar to his second trial.
1. Jeopardy did attach. Article I, section 9 of the Florida Constitution provides that "No person shall ... be twice put in jeopardy for the same offense... ." The fifth amendment to the United States Constitution, applicable to the states through the due process clause of the fourteenth amendment,[5] is substantially identical. The policy of this constitutional right is succinctly stated in Green v. United States, 355 U.S. 184, 187-88, 78 S.Ct. 221, 223, 2 L.Ed.2d 199 (1957):
The underlying idea, one that is deeply ingrained in at least the Anglo-American system of jurisprudence, is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty.
The exact points at which jeopardy will "attach" are relatively clear. The United States Supreme Court has held that jeopardy attaches in a jury case when the jury is impaneled and sworn, and in a non-jury trial when the trial judge begins to hear evidence. Serfass v. United States, 420 U.S. 377, 388, 95 S.Ct. 1055, 43 L.Ed.2d 265 (1975). We have held that jeopardy attaches on an unconditional guilty plea when *621 the plea is or should have been accepted,[6] and on a conditional plea which is accepted on conditions favorable to the defendant.[7]
The case now before us involves a negotiated and conditional plea which was accepted by the trial judge on the basis of Brown's representation that he would later perform certain acts, namely submit to a lie detector test, appear before a grand jury, and testify truthfully against Benyard. Whether the performance of the conditions preceded or was to follow submission of this agreement to the trial judge, once it was presented and "accepted" (which in this case it was), the "risk of conviction" which marks "jeopardy"[8] was total and unequivocal, just as in the case of an unqualified plea. Jeopardy had "attached." However,
the conclusion that jeopardy has attached begins, rather than ends, the inquiry as to whether the Double Jeopardy Clause bars retrial.[9]
2. Reprosecution is not barred. Federal jurisprudence has evolved the notion that once a person has been placed in jeopardy he cannot be tried again unless his first trial was cut short either for "manifest necessity" or to meet the "ends of public justice." Illinois v. Somerville, 410 U.S. 458, 93 S.Ct. 1066, 35 L.Ed.2d 425 (1973); United States v. Perez, 22 U.S. (9 Wheat.) 579, 6 L.Ed. 165 (1824). No authority has been brought to our attention as to the double jeopardy effect of a non-consensual vacation of a guilty plea because the defendant later has refused to perform a condition of his plea bargain. Our analysis must turn, then, to the principles which underlie or are served by the double jeopardy bar and the standards which led to the "manifest necessity" and "ends of public justice" limitations thereon. No mechanical test is available.
The double jeopardy limitations appear to have evolved in the federal sphere in order to balance our founders' concern for an accused's right to a final determination in one proceeding (a freedom from state harassment) against society's interest in assuring that a trial (or substituted determination of innocence or guilt) will be held and concluded for all accuseds. Each case, it is said, must be decided on its peculiar facts.[10] We have seen the individual's constitutional right overbalanced by the state's interest where a first prosecution is nullified by the affirmative act of a defendant, such as a motion for a mistrial[11] or an appeal of a conviction,[12] and we have seen the state's interest subverted to the individual's where the cause of dismissible or reversible error can be traced to prosecutorial or judicial overreaching.[13] We have also seen the state's interests given dominance where the judicial process itself ceases to function and a particular proceeding must be aborted, such as in the case of a hung *622 jury[14] or external exigencies.[15] These instances suggest that the United States Supreme Court will not allow the double jeopardy clause to be used either for prosecutorial or judicial manipulations designed to thwart a defendant's "one trial" right, or to reward criminal defendants when a nonprosecutorial or non-judicial accident affects the trial process itself. With these rough guideposts, we can examine the plea bargaining process as it relates to our criminal justice system.
The basic framework in which plea bargains are currently viewed was stated by the United States Supreme Court in Santobello v. New York, 404 U.S. 257, 261, 92 S.Ct. 495, 498, 30 L.Ed.2d 427 (1971):
Disposition of charges after plea discussions is not only an essential part of the process but a highly desirable part for many reasons. It leads to prompt and largely final disposition of most criminal cases; it avoids much of the corrosive impact of enforced idleness during pre-trial confinement for those who are denied release pending trial; it protects the public from those accused persons who are prone to continue criminal conduct even while on pretrial release; and, by shortening the time between charge and disposition, it enhances whatever may be the rehabilitative prospects of the guilty when they are ultimately imprisoned.
Both that Court and this have placed the plea bargaining process under close judicial scrutiny in a proceeding required to be conducted in public.[16] These safeguards are superimposed in order to guarantee intelligent waiver of a defendant's rights to a jury trial, to confront the witnesses against him, to present witnesses in his own behalf, and to be convicted only upon proof beyond a reasonable doubt,[17] all of which are relinquished in exchange (as it were) for the public's inability to incarcerate or fine the defendant to the full extent of the penalties assigned to the particular conduct by the public's elected representatives. Both values derive their legitimacy from "the public interest," as is recognized by the American Bar Association's Section of Criminal Justice[18] and by this Court.[19] Six specific considerations are listed by the American Bar Association as appropriate in determining whether a trial judge should accept concessions made by a prosecutor during the course of plea negotiations. The fifth of these is of particular relevance here:
(5) that the defendant has given or offered cooperation when such cooperation has resulted in or may result in the successful prosecution of other offenders engaged in equally serious or more [sic] criminal conduct... .[20]
Bargained guilty pleas, then, are in large part similar to a contract between society and an accused, entered into on the basis of a perceived "mutuality of advantage."[21]
Without commenting on the need or desirability of plea bargaining as a general matter, it is apparent what would follow from Brown's contention that the attachment of jeopardy mechanically bars subsequent prosecution. Both the state and criminal defendants would be discouraged from considering plea negotiations which contemplate the defendant's promise to testify in another case. The promise would be unenforceable by the state and therefore of little value to prosecutors. A defendant would be hesitant to enter into an agreement which required performance of his *623 promise before he knew the bargain would be accepted by a judicial officer. Given the fact of negotiated pleas in our society, then, no "public interest" would be served by Brown's construction of the double jeopardy clause in conditional plea cases.[22]
We hold, therefore, that the double jeopardy clause does not bar the reprosecution of an accused who willfully refuses to perform a condition of a guilty plea which has been accepted by the trial court on that basis. Further, in light of our colloquy with counsel during oral argument, we now hold that the state was not barred from bringing the second prosecution on the original charge of first-degree murder, despite the fact that the vacated plea had been for a lesser degree of criminality.[23]

(b) Asserted Trial Errors

We have considered together Brown's contentions regarding hearsay testimony and improper prosecutorial comments, since in this case they are inextricably connected. As stated above, the interrogating officer who eventually obtained Brown's confession testified that Simmons and Brown were brought together and informed of their rights. He testified that Simmons was then asked whether Brown was involved in the murder of Goldstone. Over defense objection, the officer was permitted to testify that Simmons "hesitated for approximately a minute before making an answer and then he said yes." (The trial judge ruled the testimony admissible because Brown was present when Simmons spoke.) The officer further testified that Simmons was taken from the interrogation room after a further period of silence, and Brown was again informed of his right to remain silent. Brown then confessed in detail to his role in the murder.
The record discloses that discussion concerning Brown's preconfession silence first arose in defense counsel's cross-examination. In subsequent closing argument, defense counsel attempted to convince the jury that Brown's confession was the product of fear and questioning by an experienced investigator. To achieve this, defense counsel emphasized that on every prior occasion Brown had willingly undergone numerous hours of questioning and had willingly told police that he received the stolen car from Benyard. Counsel rhetorically asked whether a person guilty of murder would volunteer the names of accomplices then unknown to the police and concluded that it was the coercive atmosphere of the interrogation room  the prolonged silence punctuated by the single word "yes" combined with the accuser's being removed from the room before Brown had an opportunity to respond  which finally forced a confession from the sixteen-year-old's lips.
The state sought to counter the picture painted by the defense by describing Brown as a murderer who calculated that while the police could connect him to the stolen car they could not connect him to the murder so long as his co-conspirators would not talk. The state suggested that Brown had set upon a course of deception which was suddenly shattered by the accusation of Simmons. It was in this discussion that the prosecutor challenged the suggestion that Brown had no opportunity to respond, stating: "There was at least another thirty seconds... . Henry Brown's silence after the word yes was just as much an admission of guilt as everything else he said... . [Then Brown] confessed to all those details... ."
Brown argues to us that the officer's testimony as to Simmons' single-word accusation constituted hearsay and that Brown *624 was deprived of the right to confront Simmons. He further asserts that the prosecutor's comments to the jury constituted reversible error under the decision of this Court in Bennett v. State, 316 So.2d 41 (Fla. 1975).
These peculiar facts raise complex evidentiary and constitutional problems. At the threshold, we confront the state's implicit contention that a hearsay declaration becomes admissible in a criminal proceeding if, without more, it is within any established exception to the hearsay rule. That is not enough, however. The United States Supreme Court, in its plurality opinion in Dutton v. Evans, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970), cited with approval in Mancusi v. Stubbs, 408 U.S. 204, 213, 92 S.Ct. 2308, 33 L.Ed.2d 293 (1972), has made clear that hearsay is admissible in a criminal trial only if there are sufficient "indicia of reliability" to allow the jury to determine truthfulness without the benefit of cross-examination.[24]
In this case, the trial judge allowed Simmons' statement into evidence on the ground that it was made in Brown's presence. It had been the rule in Florida that an accusation of crime otherwise excludable as hearsay could be admitted into evidence if it was made in the presence of a defendant who remained silent under circumstances which naturally and reasonably call for a reply.[25] This is no longer the rule of law in Florida, however, since all "admissions" derived from a defendant's silence in the course of a custodial interrogation (as occurred in this case) are absolutely barred from the defendant's trial. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).[26]
We nonetheless conclude that Simmons' statement was admissible in this case, in that it simply was not hearsay. The principal issue at trial was the reliability of Brown's confession. The jolting effect produced by Simmons' accusation was the single circumstance explaining Brown's decision to confess, both negating inferences that Brown's confession resulted from police pressure and affirmatively suggesting that Brown confessed because his previous story would no longer be credited. The testimony as to the Brown-Simmons confrontation described a critical and plainly relevant operative fact, not hearsay.[27] The testimony was, therefore, admissible.
Our next concern is the effect of this testimony on the trial in light of its amplification in closing argument. The prosecutor's comment to the jury that Brown's silence constituted a confession in the face of Simmons' accusation, which assumed the truth of Simmons' statement, went beyond the issue of voluntariness and constituted an improper use of the testimony. This error, however, was harmless in light of the entire record unless the prosecutor's remarks constituted reversible error under the rule announced by this Court in *625 Bennett v. State, 316 So.2d 41 (Fla. 1975).[28] In Bennett we held that any comment on an accused's exercise of his right to remain silent is reversible error, without regard to the harmless error doctrine. We reaffirmed that position in Shannon v. State, 335 So.2d 5 (Fla. 1976), and more recently in Clark v. State, 363 So.2d 331 (Fla. 1978). Bennett, however, articulated a prophylactic rule designed to obviate the possibility that a conviction could ever be obtained by the improper inference that a defendant's silence evidenced guilt. It was not designed to serve defendants as a "no-lose" trial tactic.
In this case testimony regarding Brown's silence was first elicited by defense counsel on cross-examination, and it was defense counsel who placed before the jury in closing argument the idea that Brown was not given an opportunity to respond to Simmons' accusation. It was certainly permissible for defense counsel to argue that the interrogation room has an oppressive atmosphere, but there is no logic in now allowing the Bennett rule to insulate the defendant's reference to his silence as a trial tactic from fair response by the prosecution. Having characterized the circumstances of the custodial confrontation and invited a prosecution response, the defense may not be granted a new trial because the state "rose to the bait."[29] This is simply not a case in which the state attempted to gain a conviction on the basis of the defendant's silence; it is a case in which the defendant sought to gain an acquittal by arguing that his brief silence proved his confession was coerced. The rule announced in Bennett is inapplicable here.

(c)Alleged Sentencing Errors

With respect to the trial court's imposition of a sentence of death following the jury's advisory sentence of life imprisonment, our precedents under the death penalty statute require a reduction of the sentence to life. The jury's recommendation is ordinarily to be followed so long as reasonable men would not disagree. Tedder v. State, 322 So.2d 908 (Fla. 1975). The jurors in this case had all the information appropriate to their "weighing" responsibility under the statute, and they found that it favored life imprisonment. The more severe penalty is not so clearly directed by the sentencing evidence that it should override the considered judgment of Brown's jury. The sentence imposed by the trial court is therefore vacated.
The conviction entered below is affirmed, and the case is remanded with directions to enter a sentence of life imprisonment. It is so ordered.
ENGLAND, C.J., and BOYD, OVERTON, SUNDBERG and HATCHETT, JJ., concur.
ADKINS, Justice, concurs in part and dissents in part: I would affirm the judgment and sentence.
NOTES
[1] Benyard's trial had to be postponed when neither Brown nor Simmons indicated they would testify at the trial, and the delay deferred trial beyond the speedy trial period established in our rules.
[2] Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976).
[3] Brown had selected isolated comments and rulings of the trial judge to demonstrate alleged hostility to counsel and resultant prejudice to the defense. Our review of the full record reveals that the firmness of the trial court's rulings was warranted, if not required, by the tactics and persistence of defense counsel in respect to evidentiary matters and various other alleged trial errors.
[4] The record does not support Brown's contention that he in fact complied with the express terms of his bargain. Although testifying against Benyard was not expressly stated to be one of the conditions, the agreement was so understood by all involved. Brown acknowledged on the record that he was expected to testify against Benyard.
[5] Benton v. Maryland, 395 U.S. 784, 794, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969).
[6] Ray v. State, 231 So.2d 813 (Fla. 1969). This rule is consistent with federal decisions in this area. See United States v. Williams, 534 F.2d 119 (8th Cir.), cert. denied, 429 U.S. 894, 97 S.Ct. 255, 50 L.Ed.2d 177 (1976). United States ex rel. Metz v. Maroney, 404 F.2d 233 (3d Cir.1968), cert. denied, 394 U.S. 949, 89 S.Ct. 1287, 22 L.Ed.2d 483 (1969); cf. Kercheval v. United States, 274 U.S. 220, 223, 47 S.Ct. 582, 583, 71 L.Ed. 1009 (1927) ("A plea of guilty ... is itself a conviction. Like a verdict of a jury it is conclusive. More is not required; the court has nothing to do but give judgment and sentence.").
[7] Troupe v. Rowe, 283 So.2d 857 (Fla. 1973).
[8] Submission of the guilt or innocence question to the person (judge) or persons (jury) with authority to make that determination constitutes jeopardy. See Reyes v. Kelly, 224 So.2d 303 (Fla. 1969), cert. denied, 397 U.S. 958, 90 S.Ct. 961, 25 L.Ed.2d 142 (1970).
[9] Illinois v. Somerville, 410 U.S. 458, 467, 93 S.Ct. 1066, 1072, 35 L.Ed.2d 425 (1973).
[10] United States v. Jorn, 400 U.S. 470, 480, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971).
[11] United States v. Dinitz, 424 U.S. 600, 96 S.Ct. 1075, 47 L.Ed.2d 267 (1976).
[12] United States v. Ball, 163 U.S. 662, 672, 16 S.Ct. 1192, 41 L.Ed. 300 (1896). But see Burks v. United States, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978).
[13] See United States v. Jorn, 400 U.S. 470, 485 n. 12, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971).
[14] United States v. Perez, 22 U.S. (9 Wheat.) 579, 6 L.Ed. 165 (1824).
[15] Wade v. Hunter, 336 U.S. 684, 69 S.Ct. 834, 93 L.Ed. 974 (1949) (wartime field trial impossible to continue).
[16] See Fla.R.Crim.P. 3.171.
[17] See Santobello v. New York, 404 U.S. 257, 264, 92 S.Ct. 495, 498, 30 L.Ed.2d 427 (1971) (Douglas, J., concurring).
[18] ABA Section of Criminal Justice, Pattern Rules of Court and Code Provisions § 10-1.9(a) (1975).
[19] See Davis v. State, 308 So.2d 27 (Fla. 1975).
[20] ABA Section of Criminal Justice, supra note 18.
[21] Brady v. United States, 397 U.S. 742, 752, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970).
[22] See United States v. Dinitz, 424 U.S. 600, 609, 96 S.Ct. 1075, 47 L.Ed.2d 267 (1976).
[23] See United States v. Anderson, 514 F.2d 583 (7th Cir.1975). See also Bishop, Broken Bargains, 50 J. Urban L. 231 (1972); Note, United States v. Anderson  The Plea Bargain as an Agreement to Become and to Remain Convicted, 17 Wm. & Mary L.Rev. 383 (1975); 7 Ind.L. Rev. 761 (1974). We express no view as to the permissibility of reprosecution for a crime in a higher degree than the original charge after a negotiated plea has been vacated. Different considerations would be involved in such a case. See Blackledge v. Perry, 417 U.S. 21, 94 S.Ct. 2098, 40 L.Ed.2d 628 (1974).
[24] See also Hoover v. Beto, 467 F.2d 516 (5th Cir.), cert. denied, 409 U.S. 1086, 93 S.Ct. 703, 34 L.Ed.2d 673 (1972). We need not determine here the significance of the "not `crucial' or `devastating'" language in the Dutton plurality opinion. See Comment, The Uncertain Relationship Between the Hearsay Rule and the Confrontation Clause, 52 Tex.L.Rev. 1167, 1181-93 (1974).
[25] See, e.g., Albano v. State, 89 So.2d 342 (Fla. 1956); Kemp v. State, 48 So.2d 756 (Fla. 1950); Edwards v. State, 155 Fla. 550, 20 So.2d 916 (1945); Autrey v. State, 94 Fla. 229, 114 So. 244 (1927); Roberts v. State, 94 Fla. 149, 113 So. 726 (1927); Mumford v. State, 70 Fla. 424, 70 So. 399 (1915); Sumpter v. State, 45 Fla. 106, 33 So. 981 (1903). Additionally, this Court long ago recognized that the special circumstances of custodial interrogation could affect the reliability of admissions by silence. Dedge v. State, 128 Fla. 343, 174 So. 725 (1937).
[26] See Doyle v. Ohio, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976); Jones v. State, 200 So.2d 574 (Fla.3d DCA 1967), cited with approval in Bennett v. State, 316 So.2d 41 (Fla. 1975). The continued vitality of this hearsay exception where the silent admission occurs in the presence only of private persons is not before us.
[27] See generally J. Wigmore, Evidence § 1766 (J. Chadbourne rev. 1976).
[28] This point has been properly preserved for review by virtue of defense counsel's immediate, though unsuccessful, objection and motion for mistrial. See Clark v. State, 363 So.2d 331 (Fla. 1978).
[29] See Clark v. State, 363 So.2d 331, 334-35 (Fla. 1978) ("A defendant may not make or invite an improper comment and later seek reversal based on that comment.").