497 So.2d 875 (1986)
Robert KOENIG, Appellant,
v.
The STATE of Florida, Appellee.
No. 83-2692.
District Court of Appeal of Florida, Third District.
January 28, 1986.
On Rehearing December 2, 1986.
*876 Gelber, Glass & Durant and N. Joseph Durant, Jr., Miami, for appellant.
Jim Smith, Atty. Gen. and Anthony C. Musto, Sp. Asst. Atty. Gen., for appellee.
Before SCHWARTZ, C.J., and DANIEL S. PEARSON and JORGENSON, JJ.
DANIEL S. PEARSON, Judge.
Although we agree with the defendant that, absent a determination that he had exercised his peremptory challenges to exclude blacks from the jury solely because of their race, the trial judge was without authority to discharge the jury pool on the ground that there was not "any black member on the jury," there is absolutely no evidence in this record  and, indeed, not even a suggestion below  to indicate that the trial judge's action in discharging this initial jury pool for the reason stated unlawfully inhibited the defendant's right to freely exercise peremptory challenges to prospective jurors in the ensuing jury pool from which the jury that convicted the defendant was selected. Thus, though error there be, there is no palpable connection between it and the jury that tried and convicted the defendant. We therefore affirm the defendant's conviction.

I.
The defendant, Robert Koenig, was brought to trial on an indictment charging him with manslaughter. The evidence at trial would reveal that Koenig, at the time of the incident an on-duty police officer employed by Metropolitan Dade County, is white and that the victim of the shooting, Donald Harp, was black.
During the jury selection process, Koenig peremptorily challenged four prospective jurors, all of whom were black. There were no blacks among the five jurors left in the jury box, and apparently only one black person remained in the pool of prospective jurors. It was unlikely, however, that this fifth black prospective juror would, in the ordinary course of the selection process, be called to serve. Faced with the seeming inevitability of an allwhite jury, the trial judge intervened:
"I have to tell you, I'm looking for a fair and impartial jury of one's peers of a cross section of the community and that's going to possibly eliminate one of the cross sections of the community.
"We may have Latin, you may have white, but you are not going to have any blacks on the jury. And, I may find the matter of manifest necessity to start all over again, not on this jury panel before you exercise your challenges but to start again. I do have to advise you of that.
"You're entitled to your challenges, don't get me wrong, but we may have to start all over again and dismiss this panel. I don't know. Let's see.
"[PROSECUTOR]: It's obviously important that we have a cross section of the community. As I see it now, the last remaining black will not be reached.
"THE COURT: I don't know how counsel can go, one, two, three, four, five, six, seven. That's eight away.
"[PROSECUTOR]: I have five remaining. He has one remaining.
"THE COURT: That's  you may not want to let go of anybody here as well.
"Anybody have any solutions to this one?
"[DEFENSE COUNSEL]: I don't, Your Honor.
... .
"[PROSECUTOR]: Your Honor, seeing that we have a panel of five blacks and four have been struck, I would ask at this time if Defense could stipulate, if the fifth black prospective juror would be taken out of turn, thus saving us the trouble of doing 
"[DEFENSE COUNSEL]: You mean you want to choose one and put [him] on?
"[PROSECUTOR]: No, I'm saying by stipulation we could choose the remaining on the jury who is Mr. Gabriel.
"THE COURT: You mean by stipulation out of turn?
"[PROSECUTOR]: Obviously.
"THE COURT: That would be about the only way it could be done. You understand my problem? Once again, I want *877 to get a fair, not a favorable jury, one way or another, fair and impartial. The community is entitled to it, regardless. Okay.
"My giving  I'm giving you insight to judicial feelings. I have no way to pick a jury. It's not in my power, not within my purview to pick one individual and not another individual. I think you've got generally a decent group of people that would be fair and impartial.
"My suggestion is to go along with the State, or in the alternative, review one of your peremptory challenges that you've used here.
"It's entirely up to you as Defense attorney, or say, while, maybe you've reconsidered it, you wish to withdraw that particular one since I'm pretty liberal in my back strikes. If you don't want to, of course, you don't have to.
"[DEFENSE COUNSEL]: I understand.
"THE COURT: You understand the situation that I'm facing here. I want to make sure we have a good cross section. It only takes one person for a cross section, as far as I'm concerned.
"This community is basically three individuals or entities here, identifiable for years here and it's not like Perry, for example. You might have two areas of the community but here there's three and they all kind of want to be represented on the jury.
"Again, it's your decision and you are the attorney. That is one of my suggestions, or the State's suggestion, but to go and start tomorrow the whole selection if for some of you, you don't feel comfortable with any of these particular jurors, that will be okay. We'll start again. It will be up to you.
... .
"THE COURT: ... So, you'll understand maybe I'm not saying that there was anything systematic but I don't want to end up with a problem... .
... .
"[DEFENSE COUNSEL]: I understand what the Court has said but I'm saying to the Court that we can reach no stipulation concerning the seating of jurors and can only insist that we proceed as the  in the order we've been proceeding in this trial up until this point.
"THE COURT: Okay. We have five tentative jurors. We're up to [Mr.] Cuba who is the first one in the second row."
Jury selection continued with the State exhausting its allotted six peremptory challenges. The lone remaining black person in the pool, Mr. Gabriel, was not yet called and would not be unless two of the jurors then in the jury box were challenged. The trial judge sustained the defendant's objection to the State's motion that it be given two additional peremptory challenges. The trial judge summarized the proceedings as they then stood and announced his decision to discharge the entire jury pool because no black had been chosen to sit on the jury:
"THE COURT: ... What that leaves us with is six potential jurors. The only possible  let's see, there seems to as if it's going to be an impossibility at this point in time, even if Defense were to exercise a challenge but one, two, three, four, five, six, we have six potential jurors. State has no challenges for cause to enter. There is one peremptory challenge left the Defense.
"Do you wish to exercise it?
"[DEFENSE COUNSEL]: No, Your Honor.
"THE COURT: Okay. So at this point in time it would appear that we would have a potential jury of one, two, three Latin females, one  two Anglo females, and we refer to Anglo here in Miami  one Anglo male, there not being any black member on the jury.
"The Court would feel absolutely to dictate a good conscious [sic] and ability to sleep to dismiss this entire jury panel and see if we can start tomorrow to find something that would be acceptable to both State and Defense, a good cross section of the community.
... .
"We have to work extra hard which means we'll start again tomorrow. If we can get a jury that is acceptable in the *878 Court's mind to be a fair and impartial jury panel of one's peers, then at that point in time we'll probably go into the opening tomorrow and go late.
"The Court, in its judgment had made a determination that we are going to go ahead and dismiss this jury panel on the doctrine of manifest destiny [sic][1] in an effort to get a fair and impartial jury panel of one's own peers, cross section of the community. This, of course, is not to say that there's  let's just say that it was the makeup of the entire panel itself that did not lend itself, in the eyes of State or Defense, to end up with the jury panel that would be fair and impartial. "On that basis, we go ahead and start again tomorrow. We'll dismiss this jury. Nobody has been sworn in so it's not a Defense of jeopardy."[2]
The defendant objected to the discharge of the jurors. The following day, another jury was selected from a freshly summoned pool of potential jurors. Like its discharged predecessor, this jury, which tried and convicted the defendant, had no black members.[3]

II.
Our determination that the trial court's discharge of the initial jury was unauthorized is based upon our examination of the relationship between the defendant's peremptory challenge right guaranteed by Section 913.08, Florida Statutes (1983),[4] and Florida Rule of Criminal Procedure 3.350,[5] and the prohibition announced in State v. Neil, 457 So.2d 481 (Fla. 1984),[6] against peremptorily *879 challenging jurors solely on the basis of race. As we detect it, the defendant's argument is that the trial judge, although perhaps acting with the best of intentions, improperly interfered with the defendant's peremptory challenge right when he discharged the unsworn but fullyselected jurors and jury pool without determining, as Neil requires, that the defendant had excluded blacks from the jury solely on the basis of race.

A.
The right to peremptorily challenge prospective jurors, guaranteed in Florida by statute and rule,
"has been held to be essential to the fairness of a trial by jury and has been described as one of the most important rights secured to a defendant. Pointer v. United States, 151 U.S. 396, 14 S.Ct. 410, 38 L.Ed. 208 (1894); Lewis v. United States, 146 U.S. 370, 13 S.Ct. 136, 36 L.Ed. 1011 (1892). It is an arbitrary and capricious right which must be exercised freely to accomplish its purpose. It permits rejection for real or imagined partiality and is often exercised on the basis of sudden impressions and unaccountable prejudices based only on the bare looks and gestures of another or upon a juror's habits and associations."

Francis v. State, 413 So.2d 1175, 1178-79 (Fla. 1982).
See also Commonwealth v. Soares, 377 Mass. 461, 483 n. 24, 387 N.E.2d 499, 513 n. 24, cert. denied, 444 U.S. 881, 100 S.Ct. 170, 62 L.Ed.2d 110 (1979) (peremptory challenge is "one of the most important of the rights secured to the accused"). Although the peremptory challenge is not of constitutional dimension, see State v. Neil, 457 So.2d 481, 486 (Fla. 1984), Commonwealth v. Soares, 377 Mass. at 483 n. 24, 387 N.E.2d at 513 n. 24, it
"plays the salutary role of providing a basis of exclusion of a prospective juror who, as a result of circumstances relating to the particular case, the parties, or the witnesses, is not impartial, or who is perceived by a party in good faith not to be impartial or to be less impartial than other prospective jurors, but whose lack of impartiality cannot be established by conventional proof to justify a disqualification for cause."

People v. Thompson, 79 A.D.2d 87, 105, 435 N.Y.S.2d 739, 752 (1981).[7]
Being thus akin to the challenge for cause, and being a tool to further insure the right to a fair and impartial jury, the peremptory challenge is to be "preserved in its fullest measure." Id.
Nevertheless, as the Supreme Court of Florida recognized in State v. Neil, 457 So.2d 481, 486, the right to an impartial jury  "[t]he primary purpose of the peremptory challenge"  is undermined when such challenges are used "solely as a scalpel to excise a distinct racial group from a representative cross section of society." Id. Accordingly, Neil instructs us that neither the State nor a defendant may exercise peremptory challenges solely on the basis of race. Where it is determined by the trial judge that a party "has actually been challenging prospective jurors solely on the basis of race, then the court should dismiss that jury pool and start voir dire over with a new pool." State v. Neil, 457 So.2d at 487. Thus, in the present case, the trial judge's discharge of the jury pool would have been permissible only had he concluded upon substantial evidence that the defendant had peremptorily challenged the four black prospective jurors solely because they were black.

B.
In our view, State v. Neil defines the outer limits of interference with the exercise of peremptory challenges  their exercise may be enjoined through the device *880 of dismissal of the pool only when the court concludes, after inquiry, that a party is challenging jurors solely on the basis of race. Interference is therefore not permitted simply because the prospective jury is lacking a member of a particular race, or does not, as in the opinion of the court below, have "a good cross section." As the United States Supreme Court stated in Taylor v. Louisiana, 419 U.S. 522, 538, 95 S.Ct. 692, 702, 42 L.Ed.2d 690, 702-03 (1975):
"It should also be emphasized that in holding that petit juries must be drawn from a source fairly representative of the community we impose no requirement that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population. Defendants are not entitled to a jury of any particular composition.... ."[8],[9]
Neil establishes that before the trial court dismisses a jury pool on the ground that peremptory challenges have been exercised in a discriminatory manner, first, it must decide that "there is a substantial likelihood that the peremptory challenges are being exercised solely on the basis of race"; then, it must conduct an inquiry in which the complained-about party has the opportunity and burden "to show that the questioned challenges were not exercised solely because of the prospective jurors' race"; and finally, it must conclude that the complained-about party "has actually been challenging prospective jurors solely on the basis of race." State v. Neil, 457 So.2d at 486-87. The court below, being without the benefit of the later-decided Neil, quite obviously satisfied none of these predicates to dismissal of the jury. Clearly, the fact that the jury did not contain a black is not tantamount even to a finding that there was a substantial likelihood that the defendant was exercising peremptory challenges solely on the basis of race, much less the required conclusion, after inquiry, that race was actually the sole motivation for the challenges. The presumption that peremptory challenges are being properly exercised is not overcome merely because a party "has used a particular number of his peremptory challenges to exclude black potential jurors." State v. Neil, 457 So.2d at 486 (quoting People v. Thompson, 79 A.D.2d at 110-11, 435 N.Y.S.2d at 755). Furthermore, a fair reading of the record suggests that the trial judge was desirous of insuring that a black be included on the jury, regardless of whether the defendant's peremptory challenges were, as Neil permits, "based on the particular case on trial, the parties or witnesses, or characteristics of the challenged persons other than race." State v. Neil, 457 So.2d at 487. Quite obviously, the trial judge's stated goal that blacks be included on the jury differs significantly from the permitted goal of ensuring that blacks are not improperly excluded from the jury. We find, therefore, that the discharge of the jury pool because it did not result from a determination, after inquiry, that the defendant had peremptorily challenged the black jurors solely on the basis of race, was an unauthorized encroachment upon the defendant's *881 right to exercise his allotted peremptory challenges.

III.
All that has been said thus far concerns prospective jurors who, because prematurely discharged, had nothing to do with the trial and conviction of the defendant. As we have noted, no claim was made  below or here  that this second proceeding should have been barred as violative of the prohibition against an accused being placed twice in jeopardy for the same offense. As we have also noted, no claim was made  below or here  that the trial judge's actions in the first proceeding in some manner affected the second proceeding. What we do know is that the jury that tried and convicted the defendant did not have a black person on it, and that the prospective jurors whom the defendant peremptorily challenged were apparently black. Any present claim  and, again, there is none  that the trial judge's discharge of the initial jury panel may have somehow fettered the defendant's exercise of his peremptory challenges is therefore the purest conjecture and, moreover, likely belied by the facts. Accordingly, the judgment and sentence under review are
Affirmed.

ON REHEARING
PEARSON, DANIEL, Judge.
When we initially decided this case and affirmed the defendant's conviction, we observed that Koenig had waived any claim that the constitutional guarantee against being twice placed in jeopardy barred his prosecution and conviction. See p. 878 n. 2, supra. Several days after our decision was made public, the Florida Supreme Court held that "the failure to timely raise a double jeopardy claim does not, in and of itself, serve as a waiver of the claim." State v. Johnson, 483 So.2d 420, 423 (Fla. 1986). Because of this pronouncement of our state's highest court, we granted rehearing, specifically requesting the parties to address in supplemental briefs and argument the question whether double jeopardy could act as a bar to conviction in a case, as here, where the jury first selected was discharged before being sworn because the trial court was displeased with its make-up. Having now reheard the case, we are persuaded that, as the State has urged, the constitutional guarantee against being twice placed in jeopardy was simply not implicated by the lower court's actions  no matter how unauthorized  which prevented the jury from being sworn. We thus adhere to our affirmance of the defendant's conviction.
As the State correctly notes, and the defendant concedes, the decisions are legion that jeopardy does not attach in cases to be tried before a jury until the jury is empaneled and sworn. See, e.g., Crist v. Bretz, 437 U.S. 28, 98 S.Ct. 2156, 57 L.Ed.2d 24 (1978); Serfass v. United States, 420 U.S. 377, 95 S.Ct. 1055, 43 L.Ed.2d 265 (1963); Brown v. State, 367 So.2d 616 (Fla. 1979); Kennick v. State, 107 So.2d 59 (Fla. 1st DCA 1958). Without dispute, the courts of this country, both state and federal, have time and again applied this principle in rejecting double jeopardy claims where a trial court terminated proceedings, properly or improperly, during some stage of jury selection before the actual swearing of the jury. See, e.g., United States v. Wedalowski, 572 F.2d 69 (2d Cir.1978); United States v. Gates, 557 F.2d 1086 (5th Cir.1977), cert. denied, 434 U.S. 1017, 98 S.Ct. 737, 54 L.Ed.2d 763 (1978); Durham v. Wyrick, 545 F.2d 41 (8th Cir.1976); United States v. Whitman, 480 F.2d 1028 (6th Cir.), cert. denied, 414 U.S. 1026, 94 S.Ct. 453, 38 L.Ed.2d 318 (1973); United States v. Dichiarinte, 385 F.2d 333 (7th Cir.1967), cert. denied sub nom. Mastro v. United States, 390 U.S. 945, 88 S.Ct. 1029, 19 L.Ed.2d 1133 (1968); Alexander v. Fogliani, 375 F.2d 733 (9th Cir.1967); McMorris v. State, 394 So.2d 392 (Ala. Crim. App. 1980), cert. denied, 394 So.2d 404 (Ala. 1981), cert. denied, 452 U.S. 972, 101 S.Ct. 3127, 69 L.Ed.2d 983 (1981); Shaw v. State, 239 Ga. 690, 238 S.E.2d 434 (1977), cert. denied, 438 U.S. 905, 98 S.Ct. *882 3123, 57 L.Ed.2d 1148 (1978); State v. Sermon, 404 So.2d 261 (La. 1981); Commonwealth v. Soares, 377 Mass. 461, 387 N.E.2d 499, cert. denied, 444 U.S. 881, 100 S.Ct. 170, 62 L.Ed.2d 110 (1979); Chandler v. State, 140 Miss. 524, 106 So. 265 (1925); Fields v. State, 627 S.W.2d 714 (Tex. Crim. App.), cert. denied, 459 U.S. 841, 103 S.Ct. 91, 74 L.Ed.2d 84 (1982).
Unlike any of the cases cited, however, the present case is one in which the trial court's refusal to swear the selected jury was motivated by its dissatisfaction with the make-up of the jury and specifically designed to prevent jeopardy from attaching. The defendant argues that, in such a case, his valued right in retaining a chosen jury, a right protected by the constitutional guarantee against double jeopardy, Crist v. Bretz, 437 U.S. at 36, 98 S.Ct. at 2161, 57 L.Ed.2d at 32; Wade v. Hunter, 336 U.S. 684, 689, 69 S.Ct. 834, 837, 93 L.Ed. 974, 978 (1949), is as much impinged upon whether the fully selected jury is discharged before or after being sworn. Thus, the defendant urges, the arbitrary bright line requirement that the jury be sworn should be disregarded under the unique circumstances of the present case, because, as has been observed:
"The right of trial by jury is of but little value to the citizen in a criminal prosecution against him if [the guarantee against double jeopardy] can be violated and the accused left without remedy. If the judge can arbitrarily discharge and impanel juries until one is obtained that will render such a verdict as the state demands, or the attorney for the prosecution desires, and the only protection against such oppression is that a new trial may be ordered in the court trying him, or by the court of last resort, then of what value is this boasted right?"

O'Brian v. Commonwealth, 72 Ky. [9 Bush] 333, 339 (1872), quoted in Crist v. Bretz, 437 U.S. at 46, 98 S.Ct. at 2166, 57 L.Ed.2d at 38 (Powell, J., dissenting).
See also Schulhofer, Jeopardy and Mistrials, 125 U.Pa.L.Rev. 449 (1977).
It is apparent in the foregoing observation that the concern there expressed is the imagined bad faith effort by a trial judge to obtain a conviction-prone jury while avoiding putting the defendant in jeopardy. While we, of course, share that concern, there is absolutely no indication in the present case that the trial court, though in error, acted out of a desire to aid the prosecution or harm the defendant. Moreover, were there evidence that the proceedings were terminated in such bad faith, the argument that double jeopardy should bar further proceedings whether or not the jury was sworn, or the argument that further proceedings would violate the defendant's due process rights might very well succeed. See Schulhofer, supra, at 513 ("The due process clause presumably affords protection during the voir dire period against a mistrial deliberately induced to deprive the defendant of a potentially favorable panel."). For now, however, it is enough to note that the present case does not involve the envisioned horrible of a trial judge's effort to get a hanging jury.
The underlying policies of the constitutional guarantee against double jeopardy are
"that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty."

Crist v. Bretz, 437 U.S. at 35, 98 S.Ct. at 2160, 57 L.Ed.2d at 31.
These policies are no more or less offended when the selected but unsworn jurors are discharged for innocuous reasons or, as here, because the trial court is dissatisfied with the fact that there is no black member among them. Thus it is that each and every case which rejects the contention that the double jeopardy clause should prevent further prosecution where jury selection has been aborted before the jury is *883 sworn, decides, at least implicitly, that these underlying policies are not sufficiently disserved to merit a finding that double jeopardy bars further prosecution.[1] Since the only difference between the present case and all others is the trial court's reason for discharging the jury, the question is whether the trial court's acknowledged desire that a black person be on the jury itself compels the application of the constitutional guarantee against double jeopardy. We think it does not.
It is evident that the fact that the jury first selected in the present case was discharged because the trial court was dissatisfied with its make-up causes no more embarrassment, expense, or ordeal or any greater anxiety or insecurity to the defendant than had the jury been discharged for reasons unrelated to its make-up. And insofar as the policy of preventing the prosecution from gaining an unfair advantage through the revelation of the defendant's intended defense, to the extent that the defendant tips his hand during the interrogation of potential jurors, he tips it to precisely the same extent in any case where the jury is discharged before being sworn whether the discharge be for proper or improper reasons. As is illustrated by the usual double jeopardy cases  those involving mistrials after a jury has been selected and sworn  the double jeopardy clause is not violated simply because the prosecution has had a look at the defendant's case or because the defendant must endure further delay, see Lee v. United States, 432 U.S. 23, 97 S.Ct. 2141, 53 L.Ed.2d 80 (1977); United States v. Dinitz, 424 U.S. 600, 96 S.Ct. 1075, 47 L.Ed.2d 267 (1976).
Although the trial court's reason for discharging the fully selected but unsworn jury is, in the absence of bad faith, irrelevant to our double jeopardy inquiry, it is clearly relevant to any claim by the defendant that his peremptory challenge right during the selection of the jury that tried and convicted him was affected. Thus, had the defendant claimed that when the trial court engrafted upon his right to freely exercise his allotted peremptory challenges[2] the requirement that the jury include a black person, he, in obedience to this erroneous peremptory challenge rule, deviated from his true jury selection goals when selecting the jury that tried and convicted him, we would then have to address the impact of the trial court's action on the defendant's peremptory challenge right. But, as we have already said, no such claim below or here was ever made.
For the reasons given, we adhere to our decision to affirm.
SCHWARTZ, Chief Judge (specially concurring).
Although numerous other doctrinal bases for the double jeopardy prohibition, including many outlined in Judge Pearson's opinion,[1] have been previously asserted, the Supreme Court of the United States has now definitively placed primary, if not exclusive, emphasis upon

*884 the need to protect the interest of an accused in retaining a chosen jury. That interest was described in Wade v. Hunter, supra, as a defendant's "valued right to have his trial completed by a particular tribunal." 336 U.S. at 689, 69 S.Ct. at 837. It is an interest with roots deep in the historic development of trial by jury in the Anglo-American system of criminal justice. Throughout that history there ran a strong tradition that once banded together a jury should not be discharged until it had completed its solemn task of announcing a verdict.
Regardless of its historic origin, however, the defendant's "valued right to have his trial completed by a particular tribunal" is now within the protection of the constitutional guarantee against double jeopardy, since it is that "right" that lies at the foundation of the federal rule that jeopardy attaches when the jury is empaneled and sworn.
Crist v. Bretz, 437 U.S. 28, 35-36, 98 S.Ct. 2156, 2161, 57 L.Ed.2d 24, 31-32 (1978) (footnotes omitted). As has been observed, including by some in very high places, the logical result of the preeminence of the "valued right to have [the defendant's] trial completed by a particular tribunal" may well be a holding that the constitutional right to freedom from repeated prosecution matures at a point prior to the swearing of the jury  perhaps as early as the beginning of jury selection and certainly when, as here, the exact make-up of the particular "tribunal," the jury, has been finally determined. See Crist, 437 U.S. at 38, 98 S.Ct. at 2162, 57 L.Ed.2d at 33 (Blackmun, J., concurring); Crist v. Cline, 434 U.S. 980, 980 n. 2, 98 S.Ct. 603, 604 n. 2, 54 L.Ed.2d 475, 475 n. 2 (1977) (Marshall, J., dissenting to order restoring case to calendar). See generally Schulhofer, Jeopardy and Mistrials, 125 U.Pa.L.Rev. 449, 512-14 (1977). This line of reasoning would have particular relevance to this case, in which the mutually selected jury was discharged specifically because the trial judge, although acting out of no-doubt worthy motives, was not satisfied with its composition.
Notwithstanding all of this, the fact remains that what may be called the necessary implications of the "particular tribunal" doctrine have never been actually applied. Instead, probably for reasons related to ease of administration, the brightest of bright line rules has been mechanically adopted under which, as shown by the myriad of cases collected by the court, jeopardy is held to attach upon the swearing of the jury, Crist, 437 U.S. at 36, 98 S.Ct. at 2161, 57 L.Ed.2d at 32, and neither after, id, nor, to the point here, at any stage before that occurs. E.g., United States v. Whitman, 480 F.2d 1028 (6th Cir.1973), cert. denied, 414 U.S. 1026, 94 S.Ct. 453, 38 L.Ed.2d 318 (1973); United States v. Dichiarinte, 385 F.2d 333 (7th Cir.1967), cert. denied sub nom. Mastro v. United States, 390 U.S. 945, 88 S.Ct. 1029, 19 L.Ed.2d 1133 (1968). Because a unanimity of authority thus supports the position adopted by the court, I am compelled to concur with its conclusion that Koenig's rights under the double jeopardy clause of the fifth amendment were not violated below.
I add the observation that this conclusion may not mean that the defendant is wholly without constitutional remedy. Almost without question, Koenig was deliberately deprived of a recognized, protectable, "valued" right to be tried by a regularly constituted jury in whose selection he had participated and the composition of which he obviously approved. See Crist, 437 U.S. at 37, 98 S.Ct. at 2166, 57 L.Ed.2d at 31; Schulhofer, supra at 501-02. Particularly since, as is also self-evident, the reason that this occurred was based solely upon the perceived undesirability of the jury itself, thus implicating and contravening the very reason for the existence of the right,[2] the trial court's action may have deprived the appellant of his generalized fifth and fourteenth amendment rights to due process. See United States v. Marion, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971) (although *885 sixth amendment right to speedy trial does not arise until arrest or formal accusation, pre-arrest delay may constitute due process violation if actuated by constitutionally impermissible purpose); United States v. Gouveia, 467 U.S. 180, 104 S.Ct. 2292, 81 L.Ed.2d 146 (1984) (same). See generally Parratt v. Taylor, 451 U.S. 527, 547-48 nn. 2-5, 101 S.Ct. 1908, 1919-20 nn. 2-5, 68 L.Ed.2d 420, 436-37 nn. 2-5 (1981) (Powell, J., concurring) (collecting cases in which intent of state officials is deemed pertinent in determining whether various constitutional rights and privileges have been abridged). Since no due process claim has ever been asserted either below or here, I do not  and I agree that the court should not  directly address the very difficult issues raised by such a contention.[3] Because of its possible availability[4] and merit, however, I note that our affirmance is necessarily without prejudice to a later assertion of that claim in an appropriate motion under Florida Rule of Criminal Procedure 3.850 or otherwise.
NOTES
[1] Should read "manifest necessity."
[2] Whether the trial judge was correct when he confidently asserted that the fact that the discharged jury had not been sworn insulated his action from any double jeopardy claim need not here be decided. To be sure, there is abundant and long-standing authority supporting the proposition that jeopardy does not attach until the jury is sworn. See, e.g., Serfass v. United States, 420 U.S. 377, 95 S.Ct. 1055, 43 L.Ed.2d 265 (1975); Downum v. United States, 372 U.S. 734, 83 S.Ct. 1033, 10 L.Ed.2d 100 (1963); Brown v. State, 367 So.2d 616 (Fla. 1979). Any argument that this rule should not apply where the opportunity to claim double jeopardy is prevented by the court's allegedly arbitrary and unlawful refusal to administer the oath to a properly selected jury was waived by the defendant's failure to move to dismiss on jeopardy grounds, see Bell v. State, 262 So.2d 244 (Fla. 4th DCA), cert. denied, 265 So.2d 50 (Fla. 1972); Suiero v. State, 248 So.2d 219 (Fla. 4th DCA 1971); Robinson v. Wainwright, 240 So.2d 65 (Fla. 2d DCA 1970); Robinson v. State, 239 So.2d 282 (Fla. 2d DCA 1970) (failure to raise defense of former jeopardy at trial is waiver for future proceedings); accord Rodriguez v. State, 441 So.2d 1129 (Fla. 3d DCA 1983) (en banc) (double jeopardy claim of illegal sentence waived), rev. denied, 451 So.2d 850 (Fla. 1984); cf. Davis v. State, 459 So.2d 1120 (Fla. 3d DCA 1984) (failure to cross-appeal denial of motion for judgment of acquittal waived right to move to dismiss further proceedings on double jeopardy grounds); but see Johnson v. State, 460 So.2d 954 (Fla. 5th DCA 1984) (violation of constitutional right not to be twice placed in jeopardy is fundamental error which may be raised at any time), and, even more decisively, by his failure to raise any claim of double jeopardy in this court.
[3] The trial record does not reflect the composition of the jury. The parties stipulated in this court that the jury seated was all white, that two alternates were selected, that one of the alternates was black, and that neither of the alternates participated in the jury's deliberations. However, the record reflects that only one alternate was selected, apparently a black woman.
[4] Section 913.08 provides in pertinent part:

"(1) The State and the defendant shall each be allowed the following number of peremptory challenges:
... .
"(b) Six, if the offense charged is punishable by imprisonment for more than 12 months but is not punishable by death or imprisonment for life; ..."
[5] Rule 3.350 provides in pertinent part:

"Each party shall be allowed the following number of peremptory challenges:
... .
"(b) Six, if the offense charged is a felony not punishable by death or imprisonment for life; ..."
[6] Although State v. Neil was decided after the trial of this case, its effect was to qualify the peremptory challenge right which, pre Neil, was unqualified. If, arguendo, Neil were applied to the present case, as will be seen infra, its principles were not followed; if Neil is not applied, then the defendant's right to exercise the peremptory challenge was even greater. Our reliance on Neil in this case, however, is simply to show that it outlines the only acceptable procedure for determining that a party is abusing the peremptory challenge right, and that venireshopping by the trial court is not an acceptable substitute for this procedure.
[7] The holding of People v. Thompson was essentially adopted by the Florida Supreme Court in State v. Neil, 457 So.2d 481.
[8] This language of nonrequirement has been read by some as language of prohibition. See, e.g., Note, Peremptory Challenges and the Meaning of Jury Representation, 89 Yale L.J. 1177, 1184-85 (1980) (interpretation of Taylor that impartiality means that juries should tend to mirror subgroup proportion of community would "violate clear language of Taylor"). Compare State v. Gilmore, 199 N.J. Super. 389, 399, 489 A.2d 1175, 1180 (App.Div. 1985) ("[t]he cross-section representation rule does not require the systematic inclusion of diverse cognizable groups"). While we do not believe Taylor can be read to constitutionally prohibit affirmative inclusion of underrepresented races on petit juries, such an affirmative inclusion may unlawfully interfere, and did here, with the guaranteed right to peremptory challenges.
[9] Moreover, as one Note explained: "A requirement that petit juries actually represent each group in the community would compel court officials to select individual jurors, a practice that would provide an opportunity for abuse and an appearance of partiality. Any attempt to require proportionate representation would also present insurmountable administrative problems." Note, Limiting the Peremptory Challenge: Representation of Groups on Petit Juries, 86 Yale L.J. 1715, 1732 (1977).
[1] Given that the policies behind double jeopardy are quite well settled, the defendants urging double jeopardy in these cases can be reasonably assumed to have argued these policies, and, though not discussed in the opinions, the courts can be assumed to have rejected them. If, however, the trial court discharges the unsworn jury in bad faith and the policies behind the double jeopardy clause are implicated, as, for example, where the aborted voir dire particularly has revealed the intended defense to the advantage of the prosecution, or further delay of the trial will aid the prosecution, double jeopardy may preclude further proceedings.
[2] Subject only to the limitation delineated in State v. Neil, 457 So.2d 481 (Fla. 1984).
[1] See Green v. United States, 355 U.S. 184, 187-88, 78 S.Ct. 221, 223, 2 L.Ed.2d 199, 204 (1957):

The underlying idea, one that is deeply ingrained in at least the Anglo-American system of jurisprudence, is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty.
[2] For this reason, this case is decisively different from those in which a chosen jury is discharged without being sworn because a witness has disappeared or the prosecution is otherwise unable or unwilling to proceed for reasons unrelated to the composition of the jury. See Whitman, 480 F.2d at 1030; Dichiarinte, 385 F.2d at 336.
[3] These may include whether the "prejudice" to the defendant also arguably required to make out a due process violation, see United States v. Lovasco, 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977); United States v. Marion, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468, was established when the defendant was deprived of the initial jury, thus rendering the events of the second jury selection and actual trial irrelevant and entitling the defendant to a discharge. See Waller v. Georgia, 467 U.S. 39, 50, 104 S.Ct. 2210, 2217, 81 L.Ed.2d 31, 41 (1984) ("remedy should be appropriate to the violation").
[4] Koenig's failure to raise the point either at trial or in this appeal may preclude his doing so in a subsequent proceeding.